

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 4, 2016

**BY EMAIL AND HAND DELIVERY**

The Honorable Barbara Moses and Frank Maas
United States Magistrate Judges
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

   Re: **United States v. Parrello, et. al.**
      **16 Cr. 522 (RJS)**

Dear Judges Moses and Maas:

  The Government respectfully submits this letter in advance of today's presentments in the above-captioned case, which have been referred to this Court by the Honorable Richard J. Sullivan, United States District Judge, in order to provide the Court with a summary of relevant facts and to request detention pending trial of certain defendants.

**I.  Overview**

  **A.  The Charged RICO Conspiracy**

  On August 4, 2016, the above-captioned four-count Indictment (the "Indictment") was unsealed in the Southern District of New York.  The Indictment charges 46 defendants with various offenses, including racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d); arson, in violation of Title 18, United States Code, Section 844(h); illegal trafficking in firearms, in violation of Title 18, United States Code, Section 922; and conspiracy to commit assault in aid of racketeering, in violation of Title 18, United States Code, Section 1959(a)(6).  See Exhibit A (chart enumerating each defendant and the corresponding charges).

  The instant charges are the culmination of a multi-year joint investigation conducted by the Federal Bureau of Investigation ("FBI"), the Westchester County District Attorney's Office, the New York City Police Department ("NYPD"), and this Office.  The evidence includes thousands of hours of consensual recordings obtained by a cooperating witness ("CW-1") and an FBI Special Agent working in an undercover capacity ("UC-1").  CW-1 worked under Pasquale Parrello, a/k/a "Patsy," believed to be a Genovese Capo in charge of a crew based out of a restaurant that bears his name in the Bronx, New York (Pasquale's Rigoletto, hereinafter

August 4, 2016
Page 2

"Rigoletto").  At one point, with Parrello's approval, CW-1 began working under Joseph Merlino, a/k/a "Joey," believed to be the Boss of the Philadelphia Crime Family, who resided in southern Florida for part of the year.  UC-1 worked under Eugene O'Nofrio, a/k/a "Rooster," believed to be a Genovese Acting Capo in charge of two crews: one on Mulberry Street in New York, New York, and one located in Springfield, Massachusetts.  As evidenced by the consensual recordings made by CW-1 and UC-1, the myriad of criminal schemes pursued by Parrello, Merlino, O'Nofrio – three powerful LCN leaders – and their underlings were, in many respects, intertwined.

The Enterprise was composed of leaders, members, and associates of the Genovese, Gambino, Luchese, Bonanno, and Philadelphia Crime Families of La Cosa Nostra ("LCN"), who worked together and coordinated to engage in a multitude of criminal activities throughout the East Coast of the United States, including in Springfield, Massachusetts, the Bronx, Westchester and Manhattan, New York, Philadelphia, Pennsylvania, and Southern Florida to further the criminal goals of the Enterprise.  For example, LCN factions often worked with each other to facilitate gambling and coordinated the settling of debts through sit-downs and conspiracies to commit extortion.  Members and associates of the Enterprise have been involved in gambling, extortionate collection of loans, other extortion activities, loansharking, arson, conspiracies to commit assaults in aid of racketeering, trafficking in unstamped and purportedly stolen cigarettes, gun trafficking, credit card fraud, and health care fraud.

In addition to the inculpatory consensual recordings, the evidence also includes, inter alia, several state and federal judicially-authorized wiretaps, voluminous documentary and physical evidence, including, but not limited to, multiple firearms purchased from two members of the Enterprise, surveillance photographs, screen shots of gambling websites, slips of paper containing gambling ledgers, correspondence relating to the health care fraud scheme, photographs of the untaxed cigarettes, and prescriptions obtained through the alleged health care fraud scheme.

On or about August 4, 2016, law enforcement officers arrested approximately 37 defendants charged in the Indictment.  During the arrests, law enforcement officers recovered, among other items, three handguns and one shotgun, gambling paraphernalia, and tens of thousands of dollars.

### B.  Crimes of Violence Charged in the Indictment

The ample evidence will establish not only the existence and membership of the Enterprise, but also that certain of its members engaged in and conspired to engage in the following violent crimes.

#### 1.  Arson of Victim 1

In early 2011, an individual ("Victim-1")[1] operated an illegal gambling establishment on Saw Mill River Road, Yonkers, New York, which was around the corner from a similar

---

[1] The monikers herein are the same as those used in the Indictment.

August 4, 2016
Page 3

establishment run by Anthony Zinzi, a/k/a "Anthony Boy," and other associates of the charged Enterprise, which was also located on Saw Mill River Road in Yonkers, New York (the "Yonkers Club"). Zinzi and others paid Parrello tribute from the profits from the Yonkers Club.

While Parrello was on federal supervision stemming from a federal conviction in this Court, however, the Yonkers Club struggled. Indeed, Victim-1's club was more successful than the Yonkers Club. Zinzi suggested to other members of the conspiracy that they light Victim-1's vehicle on fire while it was outside of Victim-1's club. Then, on or about March 7, 2011, co-defendant Mark Maiuzzo, a/k/a "Stymie," and others not charged in the above-referenced Indictment located Victim-1's Hummer, poured gasoline into the vehicle, and lit it on fire.

### 2. Conspiracy to Assault and Assault of Victim-2

From on or about June 5, 2011, up to and including on or about June 6, 2011, Parrello ordered Zinzi and Ronald "The Beast" Mastrovincenzo (now deceased) to assault a panhandler ("Victim-2") in the area of Arthur Avenue and Fordham Road, Bronx, New York. Zinzi and Mastrovincenzo enlisted the help of Israel Torres, a/k/a "Buddy," and others. Victim-2 had been bothering some female customers in the neighborhood of Rigoletto in the nearby parking lot and these women complained to Parrello. Subsequently, Mastrovincenzo and others conspired to assault and assaulted Victim-2 with hopes of obtaining recognition and a better position within Parrello's crew.

Zinzi, Torres, Mastrovincenzo, and others, on Parrello's orders to "break" Victim-2's knees, went looking for Victim-2. Eventually, Victim-2 was beaten by Mastrovincenzo and CW-1 (prior to CW-1's cooperation with the Government). A New York State wiretap revealed that after the beating, Mastrovincenzo told Zinzi, in sum and substance: "[r]emember the old days in the neighborhood when we used to play baseball? . . . A ball game like that was done." Thereafter, Torres and Zinzi assisted Mastrovincenzo and CW-1 in hiding and disposing of evidence.

### 3. Conspiracy to Extort Victim-1

Pasquale Capolongo, a/k/a "Patsy," a/k/a "Pat C.," a/k/a "Mustache Pat," a/k/a "Fish," a Luchese associate and longtime bookmaker, placed large bets on behalf of several "professional gamblers" in order to conceal their status as professionals. Capolongo also placed bets himself as a gambler. In 2011, CW-1 gave Capolongo access to gambling accounts controlled by individuals known as bookmakers so that Capolongo could place bets on those accounts on behalf of professional gamblers. In turn, CW-1 received approximately 10 percent of the winnings and was also responsible to the bookmaker for the losses. As part of this arrangement, in late 2011, Capolongo obtained betting accounts on Victim-1's book through CW-1. In December 2011, Capolongo, on behalf of his bettors, won approximately $30,000 from sports wagers Capolongo placed in Victim-1's book. Victim-1 refused to pay Capolongo.

On or about December 12, 2011, CW-1 met with Parrello and explained that Capolongo won approximately $30,000 on sports wagers and that CW-1 was unable to collect because Victim-1 was refusing to pay despite CW-1's affiliation with Parrello. CW-1 asked Parrello for

August 4, 2016
Page 4

intervention on CW-1's behalf and assistance in collecting the approximately $30,000 debt from Victim-1.  Parrello agreed to help collect the debt.

Between in or about December 2011 and in or about March 2014, Parrello sent Zinzi, Torres, Vincent Terracciano, a/k/a "Big Vinny," and others to threaten and intimidate Victim-1, and collect the money for the debt.  On one such occasion, Parrello stated, in sum and substance: "You get Buddy [Torres] and let Buddy go there and choke him [Victim-1], choke him.  I want Buddy to choke him, choke him, actually choke the motherfucker…and tell him, 'Listen to me…next time I'm not gonna stop choking… I'm gonna kill you.'"

4.   Conspiracy to Extort Victim-3

Victim-3 was working as a bookmaker and had accounts with defendant John Tognino, a/k/a "Tugboat," who was controlled by Alex Conigliaro.  Conigliaro suspected that Victim-3 had allowed professional bettors to place bets and, as a result of their winning bets, Conigliaro owed approximately $400,000 to the winning bettors.

On or about February 21, 2012, Parrello summoned Victim-3 to Rigoletto.  There, Conigliaro, Parrello, and Ianniello confronted Victim-3 in a small room in the basement of the restaurant in a threatening and intimidating manner, and Conigliaro refused to pay the money owed.

5.   Conspiracy to Extort Victim-4

An unindicted co-conspirator ("CC-1") operated a gambling club in the Bronx, New York.  CC-1 was affiliated with Parrello, and, from in or about 2012 to in or about 2013, CC-1 paid Parrello approximately $500 per week in tribute in connection with the Bronx gambling club.  Another individual, Victim-4, owed tens of thousands of dollars to CC-1.  Parrello directed CW-1 to find Victim-4 to collect the money.  Torres and co-defendant John Spirito, a/k/a "Johnny Joe," a made member of the Bonanno family, tried to get a picture of Victim-4.  The plan was to identify Victim-4, bring Victim-4 to an isolated area, and confront Victim-4 about the debt.

6.   Conspiracy to Extort Victim-5

Victim-5 was a gambler who gave CW-1 access to gambling accounts.  As a result, Victim-5 incurred a debt that he did not pay.  At the same time, Victim-5 separately owed money to defendants Vincent Casablanca, a/k/a "Vinny," and Pasquale Maiorino, a/k/a "Patty Boy," members of the Luchese and Bonanno crime families, respectively.  Parrello worked with others, including members of the Genovese and Bonanno crime families, to ensure that Victim-5 paid the debt. Among other things, Parrello stated, in sum and substance, that members of Parrello's crew should:

> [C]ut his [Victim-5's] fuckin' tire.  That way he has to change the tire.  So then you know you can catch up with him. Give him a flat. Take the air out of the tire, whatever the fuck you got to do.  Then

August 4, 2016
Page 5

you catch up with him because then he's there, ya know, he's got
to get it fixed, he can't go nowhere, and then you surround the
mother fucker.  That's how yous do it.

Parrello further stated, "go ahead, get this motherfucker.  Don't make a mistake.  Get your fuckin' money."  Co-defendant Zinzi provided an icepick to use to slash the tire of Victim-5's car in order to carry out Parrello's order.  Eventually, Victim-5 agreed to make weekly payments on Victim-5's outstanding debt.

### 7.  Conspiracy to Assault Victim-6

On or about January 22, 2013, Genovese associate and defendant Anthony Vazzano, a/k/a "Tony the Wig," a/k/a "Muscles," was stabbed in the neck by Victim-6 during an altercation at a bar in the Bronx, New York (the "Bar").  Vazzano was at the bar with Mastrovincenzo and others when the stabbing occurred.  Thereafter, associates in Parrello's crew, including Mastrovincenzo and Torres, among others, at Parrello's direction, agreed to assault Victim-6 in retaliation for the stabbing.  During one such conversation, Torres stated in sum and substance that they would "whack" and "maim this mother fucker [Victim-6]."  Parrello instructed Mastrovincenzo, in sum and substance, to "keep the pipes handy and pipe him, pipe him, over here [gesturing to the knees], not on his head."

### 8.  Gun Trafficking

Between in or about January 2012 and in or about March 2012, Mitchell Fusco, a/k/a "Mitch," sold eleven firearms on three separate dates to CW-1.  Mastrovincenzo also sold guns to CW-1 and the Enterprise, including six firearms on five separate occasions between 2012 and 2013.  During a June 27, 2012 consensually recorded conversation, Parrello asked CW-1 if the guns were "clean" and directed CW-1 to "get some nines."

On or about August 20, 2012, CW-1 met with Mastrovincenzo and Zinzi.  During this recorded meeting, Mastrovincenzo asked CW-1 and Zinzi how many guns he should get, and Zinzi told Mastrovincenzo, "at least a hundred."

In addition to the violent crimes described above, the defendants engaged in myriad other criminal activity in support of the Enterprise.

## II.    Certain of the Charged Defendants Should Be Detained Pending Trial

The Government respectfully submits that there is no condition or combination of conditions that will reasonably assure the safety of the community and the future appearance of defendants Pasquale Parrello, a/k/a "Patsy," Joseph Merlino, a/k/a "Joey," Eugene O'Nofrio, a/k/a "Rooster," Israel Torres, a/k/a "Buddy," Anthony Zinzi, Alex Conigliaro, Mitchell Fusco, Pasquale Capolongo, a/k/a "Pat," Mark Maiuzzo, and Harold Thomas.

August 4, 2016
Page 6

## A. Applicable Law

The Bail Reform Act of 1984 ("BRA") ordinarily requires pre-trial release under such conditions as the Court "determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. §§ 3142(b), (c).  If, however, the Court finds "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the court "shall order the detention of the person before trial."  Id. § 3142(e)(1); see United States v. English, 629 F.3d 311, 318-19 (2d Cir. 2011); United States v. Sabhnani, 493 F.3d 63, 75 (2d Cir. 2007).  The Government bears the burden of proving risk of flight by a preponderance of the evidence, but it must prove danger to the community by clear and convincing evidence.  See 18 U.S.C. § 3142(g); Sabhnani, 493 F.3d at 74-75.

## B. **Argument for Detention**

i.   Pasquale Parrello

a.   Relevant Background

Parrello is a made and high-ranking member of the Genovese crime family, generally believed to be a Capo.  Parrello ran his organized crime crew out of Rigoletto, a restaurant he operates on Arthur Avenue in the Bronx, New York.  Parrello had meetings and sit-downs in the restaurant, above the restaurant, and in the basement of the restaurant.

As evidenced by his significant criminal history, Parrello has been engaged in organized crime for much of his life, and was undeterred by even a lengthy prison term.  On or about January 14, 2003, Parrello was convicted in the Southern District of New York for participating in a racketeering conspiracy and was sentenced to 88 months' imprisonment and 3 years' supervised release, which expired on April 22, 2011, during the pendency of the instant investigation.  See United States v. Parrello, 01 Cr. 1120 (RLC).  Indeed, the current investigation revealed that Parrello operated as a leader of the charged RICO conspiracy and ordered at least one act of violence while on supervised release.

b.   Racketeering Conduct

Parrello is charged with racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d), and conspiracy to commit assault in aid of racketeering, in violation of Title 18, United States Code, Section 1959(a)(6).  Indeed, Parrello was involved in nearly each and every racketeering act listed herein, whether his involvement was receiving tribute money from the act or giving an order to a member of his crew.  In his leadership capacity, Parrello gave several orders to members of his crew to commit acts of violence in connection with multiple extortions and conspiracies to commit assault in aid of racketeering.  These illegal schemes include, but are not limited to, the extortions of five victims, conspiracies to assault two victims, illegal trafficking in firearms, gambling, access device fraud, trafficking in contraband cigarettes, and health care fraud.

6

August 4, 2016
Page 7

Parrello's dangerousness and appetite for violence is well-documented.  In connection with Parrello's attempt to have members of his crew collect a debt from Victim-1, during a consensually recorded conversation Parrello stated, in sum and substance: "You get Buddy [Torres] and let Buddy go there and choke him [Victim-1], choke him.  I want Buddy to choke him, choke him, actually choke the motherfucker…and tell him, 'Listen to me…next time I'm not gonna stop choking… I'm gonna kill you.'"

Similarly, Parrello was merciless when it came to collecting debts he was owed.  When members of Parrello's crew were attempting to recoup the gambling debt that Victim-5 owed, Parrello counseled on how to collect the money.  For example, during a consensually recorded conversation, Parrello stated, in sum and substance, that members of Parrello's crew should:

[C]ut his [Victim-5's] fuckin' tire.  That way he has to change the tire.  So then you know you can catch up with him. Give him a flat.  Take the air out of the tire, whatever the fuck you got to do.  Then you catch up with him because then he's there, ya know, he's got to get it fixed, he can't go nowhere, and then you surround the mother fucker.  That's how yous do it.

Parrello further stated, "go ahead, get this motherfucker.  Don't make a mistake.  Get your fuckin' money."  Co-defendant Zinzi provided an icepick to slash the tire of Victim-5's car in order to carry out Parrello's order.

In yet another example of his viciousness, in connection with the conspiracy to assault Victim-6 in retaliation for the stabbing of Genovese associate Vazzano, in a consensually recorded conversation, Parrello instructed an uncharged co-conspirator, in sum and substance, to "keep the pipes handy and pipe him, pipe him, over here [on the leg], not on his head."

          c.    <u>Argument</u>

Parrello poses a dire threat to the safety of the community.  His demonstrated appetite and capacity for vengeance, control, and violence cries out for detention without bail pending trial.  By committing part of the charged offenses during his supervised release, Parrello demonstrated that no conditions imposed by this Court will keep the community safe from Parrello.

In addition to posing a considerable danger to the community, Parrello is a serious flight risk.  Given his age and the exposure that he faces as a result of his leadership role in the Enterprise and his substantial criminal history, once convicted, Parrello will likely spend the remainder of his days in prison.  His motive to flee therefore cannot be understated.

Both because of the grave danger he poses and his risk of flight, the Government respectfully requests that Parrello must be detained without bail pending trial.

August 4, 2016
Page 8

ii.   Joseph Merlino

a.   Relevant Background

Merlino is believed to be the Boss of the Philadelphia Crime Family.  Although Merlino was on federal supervised release until on or about September 6, 2014, Merlino continued to commit crimes and associate with LCN members and associates.[2]  Upon Merlino's conclusion of supervised release on or about September 6, 2014, he began working in earnest to rebuild the Philadelphia Crime Family.

This is Merlino's third federal arrest.  On or about December 3, 2001, Merlino was convicted in the Eastern District of Pennsylvania of racketeering and was sentenced to 168 months' imprisonment and three years' supervised release.  On or about March 8, 1990, Merlino was convicted of theft from an interstate shipment and was sentenced to four years' imprisonment.  Merlino also has multiple state convictions.  On or about August 3, 1998, Merlino was convicted of violating the casino control act in New Jersey.  On or about July 6, 1984, Merlino was convicted of assault, complicity to assault, and complicity to possessing a weapon in New Jersey.

b.   Racketeering Conduct

Merlino is charged with racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).  He has served as a leader in the Enterprise, has been working to re-build the Philadelphia Crime Family, and was involved in, among other things, the gambling and health care fraud that were objects of the charged RICO conspiracy.  Throughout the investigation, Merlino has been captured on recordings supervising a number of individuals, questioning whether certain associates were "rats," collecting illegal gambling debt, and engaging in a fraud against health insurers and conducting at least one sit-down to resolve a debt connected to the health care fraud.

c.   Argument

Merlino's long history of acting as an LCN leader, coupled with his demonstrated unwillingness to refrain from committing serious crimes while under court supervision, make him a danger to the community sufficiently serious that detention pending trial is required.  The case against Merlino is extremely strong, consisting, in part, of numerous explicit recordings in which Merlino discussed the crimes that he was committing and exhibited his role as a leader.

Given his extensive criminal history and the need for a lengthy prison term to achieve specific deterrence, together with the overwhelming proof of his guilt, Merlino has a strong incentive to flee.  Both because he poses a significant danger to the community and a risk of flight, Merlino should be detained pending trial.

---

[2] Merlino's conduct while on supervised release led to a violation proceeding that resulted in a finding of guilt.  This was later overturned because the Court of Appeals for the Third Circuit, in *U.S. v. Merlino*, 785 F3d 79 (2015), found that the summons had not been timely issued.

August 4, 2016
Page 9

     iii.    <u>Eugene O'Nofrio</u>

        a.    <u>Background</u>

O'Nofrio is a made member of the Genovese family and is believed to be Acting Capo of the Mulberry Street Crew, based in downtown Manhattan, and in charge of a crew in Springfield, Massachusetts. At various times during the pendency of the conspiracy, UC-1 served as one of O'Nofrio's drivers and as a trusted associate and therefore captured hundreds of hours of inculpatory conversations involving O'Nofrio and others. For example, in a consensually recorded conversation, O'Nofrio told UC-1 that when "that guy" (referring to co-defendant Conrad Ianniello) went to jail (on a conviction in the Eastern District of New York) that O'Nofrio would be in charge. O'Nofrio explained that Ianniello said to O'Nofrio, "I'm going to put you at the helm … I want you acting boss. I already told them, I want you. I had to go meet certain guys. First time I met them. They said he [Ianniello] wants you." In or about August 2014, during a consensually recorded conversation O'Nofrio explained that he was planning on proposing co-defendant Ralph Santaniello to get made [to become a member of the Genovese Organized Crime Family].

In or about 1990, O'Nofrio was convicted in federal court of conspiracy to distribute cocaine, for which he was sentenced to 109 months' imprisonment and two years' supervised release. In or about 1974, O'Nofrio was convicted in state court of aggravated assault, for which he was sentenced to an indeterminate term of 2 to 5 years' imprisonment.

        b.    <u>Racketeering Conduct</u>

O'Nofrio is charged with racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d). O'Nofrio's racketeering conduct includes, but is not limited to, a conspiracy to extend extortionate loans ("loansharking") and trafficking in untaxed cigarettes.

Again and again, O'Nofrio has used threats of violence to collect debts. For example, in August 2014, O'Nofrio and CW-1 discussed co-defendant Agostino Camacho's gambling debts to O'Nofrio. CW-1 stated that Camacho was scared of O'Nofrio, and O'Nofrio responded, "Good…guess what, he better be…I don't play." In the same conversation, with respect to another loan, O'Nofrio explained that he gave "John" $10,000 "to put on the street 4-5 years ago," and that John still owed O'Nofrio $5,300. O'Nofrio said that a debtor did not pay John, and that John is supposed to go and "crack the guy's fucking head" to get the money. Similarly, in July 2015, CW-1 met with O'Nofrio and discussed Camacho's debt. O'Nofrio said that if Camacho did not pay, O'Nofrio would "hit [him] in the head with a fucking hammer." O'Nofrio was also involved in arranging sales of untaxed cigarettes.

        c.    <u>Argument</u>

O'Nofrio poses both a risk of flight and a danger to the community, warranting his detention pending trial. The case against O'Nofrio is extremely strong, consisting, in part, of numerous explicit recordings in which O'Nofrio discussed not only the crimes that he was committing, but also his leadership role and his ability to propose associates of the Genovese

August 4, 2016
Page 10

families to become "made" members.  The recordings further demonstrate that O'Nofrio is willing to threaten violence against individuals who owe him money.

Furthermore, O'Nofrio has used his position in the Genovese family to instill fear in others and has expressed pleasure at learning that he is feared by others.  In addition to committing serious crimes as an LCN leader, O'Nofrio has demonstrated a keen ability to evade detection by law enforcement that increases his danger if released pending trial.  O'Nofrio's willingness to threaten violence, his continued commission of crimes after long terms of incarceration, his efforts to evade detection by law enforcement, and his control of other members of the Genovese family all make clear that O'Nofrio poses a real danger to the community if released on bail.

In addition, O'Nofrio's sentencing exposure (in light of his leadership role) and the strength of the case against him, makes him a risk of flight.  When O'Nofrio was arrested by law enforcement officers on or about August 4, 2016, approximately $10,000 and approximately nine cellular phones were reovered, demonstrating that O'Nofrio has large amounts of cash on hand that can readily be used to flee.  For both of these reasons, he should be detained without bail pending trial.

    iv.   <u>Israel Torres</u>

      a.   <u>Relevant Background</u>

Torres is a Genovese associate, a member of Parrello's crew, and a close and trusted confidant of Parrello.  In a consensually recoded conversation in 2013, Torres explained that Parrello would be considered "the leader" in a RICO arrest and that Torres would be "up there [in leadership]."  Torres said that he wanted to make a million dollars even if he had to take a six-year jail sentence.

Torres's arrest on the instant case constitutes the third time that he has been charged with violating federal law.  Indeed, Torres has two prior federal convictions (one for participating in a racketeering conspiracy and being a felon in possession of a firearm, and one in this District for extortion).  As a result of those convictions, Torres was sentenced to a combined 99 months' imprisonment.  In addition, Torres was twice convicted in state court for crimes relating to theft.

      b.   <u>Racketeering Conduct</u>

Torres is charged with racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).  Torres's racketeering conduct includes, but is not limited to, the extortions of three victims, conspiracies to assault two victims, access device fraud, trafficking in untaxed and purportedly stolen cigarettes, and gambling.

Among other roles he played in the charged Enterprise, Torres served as Parrello's enforcer.  Torres was often involved in settling debts owed to the organization by threats, intimidation and violence.  For example, Parrello indicated that Torres was muscle who would collect debts generated by a Yonkers gambling club that was under Parrello's protection.

August 4, 2016
Page 11

Indeed, when Parrello ordered that Mastrovincenzo and others assault Victim-2, Mastrovincenzo reached out to Torres for assistance. The day before Victim-2 was assaulted with a bat, Mastrovincenzo had encountered another panhandler and called Torres for backup. Torres, armed with a knife, arrived to assist Mastrovincenzo.

In addition to personally being ready and willing to commit acts of violence, in his leadership position within the Enterprise, Torres also instructed other co-conspirators on how to threaten and intimidate individuals who either owed money to or threatened the Enterprise. For example, during an October 10, 2012 consensually recorded meeting regarding how to confront Victim-5, Torres instructed two associates on how to intimidate Victim-5, who owed a gambling debt:

> [T]his is what you do . . . Go to the door...Ding, dong, ding, dong. . . Someone's going to answer the door. . . where's [Victim-5] we got to speak to him. We got a message for him. Understand, you have a message for him. OK, he comes down, step outside I don't want to talk in the house. [Victim-5] 'I don't want to go outside, what's up, what's up?' Step outside, I don't want to talk in the house. Understand, now he's not gonna do that, or he's gonna (UI). So, what you do, let him know, then you go to a tire, get a pick, and you do all his fuckin' tires. And you got to do it. . . . Don't say nothing. Go to the door, nice nice. And if he's not there...then you start doing. That's going to be the start of the harassment.

In connection with collecting the debt, Torres further stated, in sum and substance, "don't worry about nothing, if these motherfuckers want to get fuckin' stupid, we'll get the fuckin' pistols and we'll do what the fuck we got to do. They don't know me here. Let this happen. . . . we're not punks. . . we're gonna do the damage. . . we do what we got to do." Torres also stated that the "upper echelon" – i.e., other leaders of the charged Enterprise – had to get involved to settle the dispute.

A few months later, during another recorded conversation, Torres noted that he would take a bat and "blast" [Victim-5] across Victim-5's chest. During that same recorded conversation Torres noted, in sum and substance, that if "one of my guys gets touched, we're coming after you. And that's how the fuck it is." In connection with the conspiracy to assault, Victim-6, Torres stated in a consensually recorded conversation that they would "whack" and "maim this mother fucker [Victim-6]."

Torres was also the driving force behind the credit card fraud scheme.

    c.  <u>Argument</u>

The overwhelming evidence demonstrates Torres' capacity and appetite for violence. In the course of this investigation, Torres participated in three extortions and two conspiracies to

August 4, 2016
Page 12

commit assault in aid of racketeering.  He counseled and directed others on how to intimidate threaten others and how to commit acts of violence.  Accordingly, Torres poses a very real danger to the community that cannot be contained by any combination of conditions.  He must, therefore, be detained.

      v.   <u>Anthony Zinzi</u>

         a.   <u>Background</u>

     Anthony Zinzi is an associate of the Genovese crime family and a member of Parrello's crew.  Zinzi passed along Parrello's orders to commit an assault on a panhandler.  Zinzi also devised a plan to fire-bomb the car of an individual who ran a rival casino-style gambling club.

     Zinzi has apparently committed serious and violent crimes for decades.  In 1989, Zinzi was convicted in Bronx County Supreme Court for criminal sale of a controlled substance in the second degree and was sentenced to six years to life in prison.  In 1973, Zinzi was convicted of an unknown offense following an arrest for murder, for which he was sentenced to 6 years' imprisonment.

     At the time of Zinzi's arrest, law enforcement officers recovered a shotgun and handgun from Zinzi's home.  As a convicted felon, Zinzi is prohibited from possessing firearms. Accordingly, additional charges are likely to be filed based on Zinzi's possession of the handgun and shotgun.

     In addition, Zinzi is believed to be addicted to heroin.

         b.   <u>Racketeering Conduct</u>

     Zinzi is charged with racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d), and with aiding and abetting arson, in violation of Title 18, United States Code, Sections 844(h) and 2.  The count related to the arson carries a ten-year minimum sentence, consecutive to any sentence imposed on the racketeering conspiracy.  Zinzi's racketeering conduct includes, but is not limited to, the extortions of three victims, a conspiracy to commit assault in aid of racketeering, arson, loansharking, illegal firearms trafficking, trafficking in untaxed cigarettes, and gambling.

     As noted above, it was Zinzi who suggested to other members of the conspiracy that they light Victim-1's vehicle on fire while it was outside of Victim-1's club.  Indeed, in connection with the extortion of Victim-1, Parrello sent Zinzi and others to threaten and intimidate Victim-1. Zinzi also passed along Parrello's order to assault Victim-2 who was disturbing customers in and around Rigoletto.

     In addition, Zinzi provided the ice pick, which was seized by the FBI, for the purpose of puncturing Victim-5's tire in connection with the extortion of Victim-5.  During a consensually recorded conversation on or about December 16, 2011, in connection with Zinzi's Yonkers gambling club, Zinzi discussed their "crew" and that Zinzi might have to, in sum and substance,

August 4, 2016
Page 13

throw bricks through windows and that the "message" needed to be that they would break knee caps.

During an August 20, 2012 meeting between Zinzi, Mastrovincenzo, and CW-1, Zinzi told Mastrovincenzo to get "at least a hundred" firearms.  As noted above, on five separate occasions, Mastrovincenzo sold a total of six firearms to CW-1.

c.   Argument

Zinzi poses a clear danger to the community.  He was deeply involved in multiple extortions and the conspiracy to assault Victim-2.  Indeed, after Mastrovincenzo beat Victim-2 with a baseball bat, as captured on the wiretap, Mastrovincenzo reported back to Zinzi on the success of the sanctioned assault and spoke in thinly veiled code about a baseball game.  Zinzi also sought to purchase firearms from a co-conspirator who was in the business of illegally selling firearms.  Furthermore, it was Zinzi who suggested that members of the Enterprise firebomb a rival's car.

Particularly concerning is that at the time of his arrest, law enforcement officers found in Zinzi's home a handgun and a shotgun.  The fact that Zinzi – a convicted felon and a member of a RICO conspiracy whose objects include extortions – possessed firearms is troubling.  It is also entirely consistent with the evidence derived during the investigation, including the August 2012 consensually recorded conversation where Zinzi spoke with Mastrovincenzo about acquiring multiple firearms.  Accordingly, Zinzi's detention is necessary to protect the community from Zinzi's multitude of crimes.

Additionally, the arson charge has a ten-year mandatory minimum sentence, see 18 U.S.C. § 844(h), rendering Zinzi a risk of flight.

Given the overwhelming evidence against Zinzi, his possession of weapons, his drug dependency, and the mandatory minimum sentence Zinzi faces if convicted, the Government respectfully submits that there are no conditions which would assure the safety of the community and his appearance in Court.

vi.   Alex Conigliaro

a.   Background

Conigliaro is a made member of the Genovese family.  On or about June 15, 2006, Conigliaro was convicted in the Eastern District of New York of gambling and received a sentence of 6 months' imprisonment; he was on supervised release until on or about January 30, 2010.  On or about April 4, 2000, Conigliaro was convicted in Queens County of enterprise corruption, promoting gambling in the first degree, and conspiracy and received sentences of 2 to 6 years, 1 to 3 years, and 1 year in prison, respectively.

Like many of his co-defendants, Conigliaro was very cautious regarding law enforcement.  For example, some of the consensually recorded conversations between Conigliaro

August 4, 2016
Page 14

and CW-1 focused on being careful with cell phones and whether or not CW-1 said Parrello's name over the phone.

### b.  Racketeering Conduct

Conigliaro is charged with racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).  Conigliaro's racketeering conduct includes, but is not limited to, two extortions and gambling. Conigliaro used his position as a made member of the Genovese organized crime family to threaten and influence the outcome in two instances of extortion involving gambling debts.  In or about February 2012, Conigliaro and Conrad Ianniello, a made and high-ranking member of the Genovese family, participated in a sit down in the basement of Rigoletto.  The sit down was held because Victim-4 snuck a professional gambler into a book operated in part by Conigliaro.  Conigiliaro and Ianniello berated Victim-4 for the debt that Conigliaro now owed as a result of the gambler winning a large sum of money.  Conigiliaro did most of the talking while Ianniello used his position as a made member of the Genovese family to threaten and intimidate Victim-4.  Conigliaro and Ianniello were so aggressive that Parrello had to interrupt a few times and ask them to allow Victim-4 to explain.

Additionally, Conigliaro participated in the extortion of Victim-3 by passing a message from Ianniello to Parrello and participating in a sit down over the gambling debt owed by Victim-3.  Conigliaro then employed CW-1 to provide him with information on the professional gamblers known to CW-1.  Throughout the investigation, when Conigliaro met CW-1 at locations in Queens County, Conigliaro was concerned that law enforcement might be watching him and/or that law enforcement was listening through his and others' cell phones.

### c.  Argument

Conigliaro poses a danger to the community such that he must be detained pending trial. The ample evidence against Conigliaro, including consensual recordings, witness testimony, and physical surveillance, demonstrates his capacity for wielding power, making threats, and intimidating others.

Moreover, Conigliaro's demonstrated recidivism indicates that he poses a serious danger to the community.  Notwithstanding the fact that he has been convicted of gambling offenses and is presently charged with enterprise corruption (New York's counterpart to the federal RICO statute), he was not deterred from committing the instant offense.  Accordingly, Conigliaro should be detained without bail pending trial.

### vii.  Ralph Balsamo

### a.  Background

Balsamo is a made member of the Genovese family.  On or about December 13, 2007, Balsamo was convicted in New York County Supreme Court of attempted enterprise corruption and was sentenced to 30 to 90 months' incarceration.  On or about September 28, 2007, Balsamo was convicted in the Southern District of New York of possession of dangerous drugs, gambling, and obstructing justice and was sentenced to 97 months' incarceration and 2 years' supervised

August 4, 2016
Page 15

release.  The case against Balsamo established that he was an active member of the Genovese family from in or about the 1990s up to and including in or about 2006.  Balsamo's conduct included intimidating a witness who was the victim of a violent assault and participating in other extortions.  The charging instrument to which Balsamo pled guilty explained that he and "other members and associates of the Genovese Crime Falomily, agreed to corruptly persuade a person [(the "Victim")] to withhold information from federal law enforcement officers and truthful testimony in an official proceeding, which information and testimony related to an assault on [the Victim] in which a portion of [the Victim's] ear was bitten off."

Balsamo was released from prison in or about 2012, initially to a halfway house.  While living in the halfway house and thereafter, while on supervised release, Balsamo participated in a gambling conspiracy and identified himself as a bookmaker to CW-1.

Like many of his co-defendants, Balsamo was very cautious regarding law enforcement.  For example, when a dispute over a gambling debt arose, Balsamo participated in a sit down with co-defendant Torres and CW-1 in the back room of Balsamo's restaurant.  During the meeting, Balsamo turned up the volume of the music very loud in an attempt to thwart any law enforcement listening devices.

### b.  Racketeering Conduct

Balsamo is charged with racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).  Balsamo's racketeering conduct includes, but is not limited to, an extortion, fraud, and gambling.  Balsamo began engaging in these offenses in 2012, only a short time after being released from prison.

### c.  Argument

Balsamo's criminal history and conduct in the instant case demonstrate that he poses a danger to the community such that he must be detained pending trial.  As is detailed above, Balsamo has a history of intimidating a victim-witness in a racketeering case.  The instant case involves extortion victims, other lay witnesses, and a cooperating witness.  Balsamo has shown by his prior conduct that he poses a serious potential danger to all of these individuals if he suspects that they may testify against him.

Moreover, Balsamo's eagerness to return to criminal activity—beginning while he was still in a federal halfway house—indicates that he poses a serious danger to the community.  Notwithstanding his residence in a halfway house and his federal supervision while on supervised release, he was not deterred from committing the instant offense.  There is no reason to believe that any bail conditions that might be set pending trial would have any more of a deterrent effect or would prevent Balsamo from continuing to engage in criminal activity.  Accordingly, Balsamo should be detained without bail pending trial.

August 4, 2016
Page 16

      viii.    <u>Mitchell Fusco</u>

          a.  <u>Background</u>

Fusco is an associate of the charged Enterprise.  In that role, Fusco worked as a runner and a bookmaker for the illegal gambling businesses run by co-defendants Pasquale Capolongo and John Tognino.

On or about July 13, 2015, Fusco was convicted in Queens County of attempted enterprise corruption and received a sentence of a conditional discharge.

          b.  <u>Racketeering Conduct</u>

Fusco is charged with racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).  Fusco's primary racketeering activity was gambling.  In addition, Fusco is charged with illegal trafficking in firearms, in violation of Title 18, United States Code, Sections 922 and 2.

Between in or about January 2012 and in or about March 2012, Fusco sold eleven firearms on three separate dates to CW-1.  During a consensually recorded meeting on January 12, 2012, Fusco stated that he had guns everywhere for protection, that he could get guns from "a guy" for CW-1 and that he did not have a license to possess or carry a gun.

          c.  <u>Argument</u>

The considerable evidence against Fusco demonstrates that he is a gun trafficker and gambler.  Fusco should be detained based solely on his conduct trafficking firearms.  Fusco singlehandedly put eleven illegal handguns on the street, endangering the community.

Moreover, in or about April 2012, Fusco was stopped by investigators with the Westchester County District Attorney's Office after an observed marihuana deal and agreed to cooperate.  In return, the investigators agreed not to charge Fusco with the marihuana sale and possession.  Shortly thereafter, Fusco disappeared and did not fulfill his agreement to cooperate.  Last year, Fusco was convicted in Queens County of enterprise corruption, the New York State counterpart of RICO Conspiracy.  Furthermore, on or about August 4, 2016, when Fusco was arrested, law enforcement officers recovered approximately $3,000 and three phones.  Clearly, Fusco has ready access to large amounts of cash, rendering him an even greater risk of flight.

Given his involvement in gun trafficking, Fusco is a danger to the community and should be detained pending trial.

      ix.    <u>Pasquale Capolongo</u>

          a.  <u>Background</u>

Capolongo is an associate of the Luchese family.  The instant charge is Capolongo's second federal charge in the Southern District of New York.  On or about March 12, 1999,

16

August 4, 2016
Page 17

Capolongo was convicted in the Southern District of New York of conspiracy to conduct an illegal gambling business and conspiracy to collect credit and was sentenced to a term of 46 months' imprisonment and 3 years' supervised release.

Additionally, Capolongo has two pending state charges.  In or about February 2015, Capolongo was charged with RICO and bookmaking in Fort Lauderdale, Florida.  This case is still pending.  On or about December 2, 2014, Capolongo was charged with promoting gambling in the first degree and possession of gambling records in the first degree in Rockland County Court.  This case remains pending.

Capolongo also has several state convictions.  Between 1981 and 2000, Capolongo was convicted 11 times for gambling-related.

b.  Racketeering Conduct

Capolongo is charged with racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).  Capolongo's racketeering conduct includes, but is not limited to, the extortion of Victim-2 and gambling.

Capolongo was an avid and longtime bookmaker and has been charged and convicted of gambling offenses approximately a dozen times. With no regard for the illegality of sports gambling, Capolongo continued his pattern of gambling and racketeering activity. During this lengthy investigation, Capolongo was a constant figure over the years, always willing to participate in illegal gambling activities. Moreover, Capolongo as an associate of longtime and high ranking made member of the Luchese family and used that friendship in connection with his gambling operation.

c.  Argument

The substantial evidence against Capolongo not only demonstrates his role in the charged RICO conspiracy, but also his role in a plan to harm CW-1.  In 2014, in connection with gambling money he was owed by Camacho, Capolongo hired another individual to put a tracking device on CW-1's vehicle and surveil CW-1 and his family members.  Capolongo caused CW-1's vehicle to be broken into and ransacked.  Because law enforcement officers intervened to protect CW-1, CW-1 did not suffer actual harm.  Given that much of the instant case is based upon consensual recordings made by CW-1 and the testimony of CW-1, Capolongo should be detained because he has already demonstrated that he poses a danger to CW-1 and CW-1's family.

x.  Mark Maiuzzo

a.  Background

Maiuzzo is an associate of the Luchese family.  On or about April 8, 2016, Maiuzzo was arrested and charged in Yonkers City Court with criminal sale of a controlled substance in the first degree, conspiracy in the second degree, criminal possession of a controlled substance (cocaine and oxycodone) in the third degree, and other charges based upon evidence from 2011

17

August 4, 2016
Page 18

state wiretaps. That case is currently pending in Westchester County Court and Maiuzzo was released on a $20,000 bond. The pending state case is at least Maiuzzo's third arrest in connection with narcotics. In June 2009 and June 2006, Maiuzzo was convicted of controlled substance offenses and sentenced to terms of imprisonment. In addition, in June 2006, Maiuzzo was convicted in Westchester County Court of criminal possession of a weapon.

      b.  <u>Racketeering Conduct</u>

Maiuzzo is charged with racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d), and with arson, in violation of Title 18, United States Code, Section 844(h) and 2. The count related to the arson carries a ten-year mandatory minimum sentence, consecutive to any sentence he receives on the racketeering conspiracy. Maiuzzo's racketeering conduct includes, but is not limited to, arson and gambling.

As noted, Victim-1 operated an illegal gambling establishment on Saw Mill River Road in Yonkers, which was around the corner from the above-described Yonkers Club that Zinzi operated. New York State wiretaps and witness testimony establish that Maiuzzo recruited others to help run the card games at the Yonkers Club.

While Parrello was on federal supervision, however, the Yonkers Club struggled. Indeed, Victim-1's club was more successful than the Yonkers Club. Zinzi suggested to other members of the conspiracy that they light Victim-1's vehicle on fire while it was outside of Victim-1's club. On or about March 7, 2011, Maiuzzo and others located Victim-1's Hummer, poured gasoline into the vehicle, and lit it on fire.

Evidence regarding the arson is strong and includes, among other things, testimony from a cooperating witness, phone records, New York State wiretap evidence, consensual recordings, and photographs of the burned vehicle.

      c.  <u>Argument</u>

Maiuzzo should be detained because he poses a serious danger to the community and is a risk of flight. Maiuzzo's participation in the arson of Victim-1's vehicle demonstrates that he was willing to commit violence to further the goals of the charged Enterprise and his position therein. In addition to the instant charges, Maiuzzo has continued to engage in serious narcotics trafficking. Given his obvious danger, the mandatory minimum sentence that Maiuzzo faces if convicted, combined with the serious state drug charges he faces, Maiuzzo should be detained without bail pending trial.

      xi.  <u>Harold Thomas</u>

      a.  <u>Background</u>

Thomas is an associate of the Luchese family. On or about October 1, 2009, Thomas was charged in New York County Supreme Court with enterprise corruption. There is no reported disposition. On or about March 12, 2007, Thomas was convicted of possession of gambling records in the second degree and was sentenced to ten days' incarceration.

August 4, 2016
Page 19

b.   Racketeering Conduct

Thomas is charged with racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).  Thomas's racketeering conduct includes, but is not limited to, the extortions of two victims, loansharking, trafficking in untaxed and purportedly stolen cigarettes, and gambling.

The investigation has revealed that Thomas was frequently involved in loansharking. When the individuals who had borrowed money from him failed to make their weekly payments, Thomas often threatened violence.  For example, in a recorded conversation with UC-1 in February 2015, discussing the loan that Thomas had made to defendant Agostino Camacho, Thomas said, "I assumed he [Camacho] owed you [UC-1] a ton of money . . . because he owes me a lot of money.  And he keeps making me like a second class citizen because I don't punch his fucking teeth in . . .  If he comes, he's got to give you $300, he gives me $150 and says, I'll see you tomorrow then he ducks me tomorrow . . . He gives [other people] the whole $300 and he shorts me. . . . I should've punched his head in then."

Similarly, in September 2015, Thomas confronted Camacho in person about his failure to make the loan payments.  Thomas said to Camacho, "This is the last time you'll get my advice. The next time you don't pay me on time you'll never hear another fucking sound.  You're taking my fucking kindness for softness.  You think I'm a fucking mutt.  I'll put you right in the ground. Right here, right now.  It don't matter to me.  I don't give a fuck. . . . You think you're not going to pay me?  I don't give a fuck what that guy [O'Nofrio] is up in Connecticut.  You give him $600 a week, but you will pay me, I promise you that.  If you don't have my money the first of the month you will never hear another sound I give you word on that. . . . If you miss don't call me.  You've had enough breaks.  I've just given you the biggest break in your life. . . . [I]n about a minute I'm going to go over to the car and take the fucking pistol and I'm going to kill you."

These were not empty threats.  In one incident, Thomas and an individual called "Bobby Fingers" went to visit a debtor who had stopped paying Thomas, and "Bobby Fingers" knocked out the debtor's teeth.  Moreover, when Thomas sought to collect a debt from Victim-1, Thomas asked Parrello for assistance in collecting the debt.  As Thomas was well aware, such assistance from Parrello could include violence or threats of violence.  In fact, in connection with Parrello's attempt to have members of his crew collect a debt from Victim-1, during a consensually recorded conversation Parrello stated, in sum and substance: "You get Buddy [Torres] and let Buddy go there and choke him [Victim-1], choke him.  I want Buddy to choke him, choke him, actually choke the motherfucker…and tell him, 'Listen to me…next time I'm not gonna stop choking… I'm gonna kill you.'"  In addition to seeking Parrello's assistance, Thomas and others met in person with Victim-1, and Thomas demanded that Victim-1 repay the money that he owed to Thomas.

c.   Argument

Thomas poses both a danger to the community and a risk of flight.  Thomas has demonstrated a repeated willingness to both threaten and use violence against those individuals

August 4, 2016
Page 20

who owe him money.  As discussed above, in September 2015, Thomas said that he had a pistol in his car and threatened to kill Camacho without warning if Camacho failed to pay Thomas at any point in the future.  Thomas did not hesitate to confront debtors in person and to bring others to these confrontations to mete out violence on Thomas's behalf.  Thomas's proven willingness to threaten and use violence against those who threaten his livelihood by failing to repay their loans demonstrates that he poses a danger to both the community at large and, possibly, witnesses in the case.

Moreover, Thomas has also discussed his ability to obtain large amounts of money (tens of thousands of dollars) in a day or two.  This ready access to cash provides Thomas with sufficient resources to flee.  In light of the strength of the evidence against Thomas, his violent temper, and his sentencing exposure should he be convicted, Thomas poses a danger to the community and risk of flight such that he should be detained pending trial.

xii.    Anthony Depalma, a/k/a "Harpo"

a.    Background

Depalma is an associate of the Luchese family with several convictions in New York State.  On or about August 12, 2015, Depalma was convicted of attempted criminal usury in the second degree in Rockland County and received a sentence of a conditional discharge. On or about March 16, 2012, Depalma was convicted of promoting gambling in the first degree in Rockland County Court and was sentenced to 5 years' probation.  On or about February 25, 2011, Depalma was convicted of promoting gambling in the first degree.  Depalma is currently under probation supervision in Rockland County, New York, which expires on March 15, 2017.

On or about August 4, 2016, when law enforcement officers arrested Depalma, two handguns were recovered from Depalma's home.  As a convicted felon, Depalma is prohibited under federal law from possessing firearms, and this conduct may result in additional charges against Depalma.

b.    Racketeering Conduct

Depalma is charged with racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).  Depalma's racketeering conduct includes gambling and enlisting others to try to collect a debt on his behalf.

c.    Argument

Depalma should be detained because he constitutes a danger to the community.  As noted above, and of particular concern, is that at the time of his arrest, law enforcements officers recovered two handguns from Depalma's home.  As a convicted felon, Depalma is prohibited from possessing firearms.  Furthermore, Depalma has already demonstrated that he is ready and willing to flout the law.  Depalma's possession of firearms and continued participation in the charged Enterprise while on probation and under court-ordered supervision demonstrates that Depalma's prior convictions and sentences did nothing to deter him from committing crimes. Furthermore, Depalma has shown that he is adept at hiding his criminality from those officers

August 4, 2016
Page 21

responsible for his supervision and is willing to take great risks, even when he is well-aware that he is under supervision and faces serious consequences.  Accordingly, there are no conditions that will protect the community from Depalma, and he should be detained.

### C.  Conclusion

Based on the foregoing, the Government respectfully requests that the Court order that the above enumerated defendants be detained pending trial.

Respectfully submitted,

PREET BHARARA
United States Attorney

By:      _____/s/_____
Amanda Kramer / Abigail Kurland /
Jessica Lonergan / Jonathan Rebold /
Lauren Abinanti (SAUSA)
Assistant United States Attorneys
(212) 637-2478/2955/1038/2512

cc:    All Defense Counsel
       U.S. Pretrial Services Office