

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 5, 2016

**BY EMAIL**

The Honorable Richard J. Sullivan
United States District Judge
Southern District of New York
40 Foley Square, Room 2104
New York, NY 10007

      Re:    <u>United States</u> v. <u>Pasquale Parrello, et al.</u>
              16 Cr. 522 (RJS)

Dear Judge Sullivan:

      The Government respectfully submits this letter in connection with yesterday's unsealing of the above-referenced Indictment (the "Indictment"), and in advance of the initial pretrial conference scheduled for August 23, 2016, at 11:30 a.m. in the Ceremonial Courtroom of 500 Pearl Street. This letter provides factual background to the Indictment, outlines anticipated discovery, and proposes certain scheduling procedures for these matters in light of the Second Circuit's decision in <u>United States</u> v. <u>Casamento</u>, 887 F.2d 1141 (2d Cir. 1989).

**I.      Background**

      On August 4, 2016, the above-captioned four-count Indictment (the "Indictment") was unsealed in the Southern District of New York. The Indictment charges 46 defendants with various offenses, including racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d); arson, in violation of Title 18, United States Code, Sections 844(h) and 2; illegal trafficking in firearms, in violation of Title 18, United States Code, Sections 922 and 2; and conspiracy to commit assault in aid of racketeering, in violation of Title 18, United States Code, Section 1959(a)(6).

      The instant charges are the culmination of a multi-year joint investigation conducted by the Federal Bureau of Investigation ("FBI"), the Westchester County District Attorney's Office, the New York City Police Department ("NYPD"), and this Office. The evidence includes thousands of hours of consensual recordings obtained by a cooperating witness ("CW-1") and an FBI Special Agent working in an undercover capacity ("UC-1"). CW-1 worked under Pasquale Parrello, a/k/a "Patsy," believed to be a Genovese Capo in charge of a crew based out of a restaurant that bears his name in the Bronx, New York (Pasquale's Rigoletto, hereinafter "Rigoletto"). At one point, with Parrello's approval, CW-1 began working under Joseph Merlino, a/k/a "Joey," believed to be the Boss of the Philadelphia Crime Family, who resides in

southern Florida for part of the year.  UC-1 worked under Eugene O'Nofrio, a/k/a "Rooster," believed to be a Genovese Acting Capo in charge of crews on Mulberry Street in New York, New York, and in Springfield, Massachusetts.  As evidenced by the consensual recordings made by CW-1 and UC-1, the myriad criminal schemes pursued by Parrello, Merlino, O'Nofrio — three powerful LCN leaders — and their underlings were in many respects intertwined.

Thus, the sprawling and long-running racketeering enterprise alleged in the Indictment is composed of members and associates of the Genovese, Gambino, Luchese, Bonanno, and Philadelphia Crime Families of La Cosa Nostra ("LCN") — who worked together and coordinated to engage in a multitude of criminal activities throughout the East Coast of the United States, including in Springfield, Massachusetts; the Bronx and Manhattan, New York; Philadelphia, Pennsylvania; and Southern Florida (the "East Coast LCN Enterprise" or the "Enterprise") to further the principal criminal goal of the Enterprise, making money.  For example, LCN factions often worked with each other to facilitate gambling and coordinated the settling of debts through sit-downs and conspiracies to commit extortion.  The members of the Enterprise have been involved in gambling, extortionate collection of loans, other extortion activities, arson, conspiracies to commit assaults in aid of racketeering, trafficking in unstamped cigarettes, gun trafficking, access device/credit card fraud, and health care fraud.

In addition to the inculpatory consensual recordings, the evidence also includes, *inter alia*, several state and federal judicially authorized wiretaps, voluminous documentary and physical evidence, including, but not limited to, multiple firearms purchased from two members of the Enterprise, surveillance photographs, screen shots of gambling websites, gambling ledgers and related documents, correspondence and medication relating to the health care fraud scheme, and photographs of the untaxed cigarettes.

## II.    Discovery

Discovery produced pursuant to Rule 16 of the Federal Rules of Criminal Procedure ("Rule 16") in this case will be voluminous and is expected to include, *inter alia*, the following:

- Wiretap Material:  The investigation involved multiple state and federal wiretaps. Between 2011 and 2016, the Westchester County District Attorney's Office intercepted 11 phones, and this Office intercepted 3 phones and installed a bug in Rigoletto.  There will be numerous draft line sheets produced.  The Government will also identify any recordings that it intends to introduce as evidence at trial reasonably in advance of trial.  In addition to the foregoing, the Government will produce the application materials for each wiretap.

- Consensual Recordings:  Between 2011 and 2016, CW-1 and undercover agents[1] made more than 800 consensual recordings in this case.  As a result of these consensual recordings, there are thousands of pages of draft recording summaries and, for some recordings,

---

[1] While UC-1 was the primary undercover agent, other FBI Special Agents worked in an undercover capacity at various points in the case for brief period of time.  It goes without saying that the Government will produce all recordings of the defendants that were made by undercover agents.

transcripts.  Many of the consensual audio recordings were accompanied by video recordings. The Government will produce all video and/or audio recordings as well as their accompanying draft summary or transcript.  The Government will also produce a preliminary log of these recordings in order to assist defense counsel in identifying the recordings in which their respective clients participated.

- Pole Camera Video:  The Westchester County District Attorney's Office installed pole cameras at several locations during the investigation, and video from those pole cameras will be produced.

- Photograph/Video Evidence:  As described above, video evidence, along with photograph evidence, was obtained during many of the consensual recordings and physical surveillances conducted in connection with this investigation.  The Government will provide these videos and photographs as well as a preliminary chart of the dates this evidence was obtained.

- Pen Register and Location Information:  The Government applied for and obtained pen register and cell site data for certain defendants at various times throughout the investigation. The Government will produce the application materials for this data and the data itself, to the extent it is in the Government's possession, custody, and control.

- Police Files:  Various physical surveillances and interviews have been conducted throughout this investigation.  In addition to this, several items of evidence have been collected by law enforcement agencies other than the FBI.  The Government will produce the reports of various law enforcement officers and agents, as well as laboratory reports, ballistics reports, and intelligence reports.

- Search Warrants:  The Government executed search warrants on approximately 17 locations on August 4, 2016, in connection with the arrests in this case, and expects to search numerous cellphones seized on or about August 4.  The Government will produce all search warrant application materials and returns from August 4, as well as from other searches that have taken place during the investigation.

- Cellular Telephone Data:  Both the cooperating witness and the undercover agents in this case used cellular telephones.  The Government will produce call logs, as well as the text messages in its possession, custody, and control,[2] and emails for both the cooperating witness and the undercover agents.  In addition to, and separate from these records, there are thousands of pages of cell phone records that have been obtained as part of this investigation.  The Government will produce all cell phone records required to be produced pursuant to Rule 16.

- Individual Discovery:  The Government will produce certain material individually, including criminal history reports, U.S. Marshals Service Intake Forms and photographs, and arrest reports, including reports of any post-arrest statements.

---

[2] The Government recently learned that text messages were inadvertently not preserved for a period of time during the investigation (the dates certain are still being identified).

Given the volume of discoverable material, the Government expects to produce the above-referenced categories of discovery in two phases:  Phase I within 45 days of the initial pretrial conference scheduled for August 23, 2016, and Phase II within an additional 45 days.[3] As stated above, however, this investigation is ongoing.  Accordingly, the Government will continue to produce discovery on a rolling basis.

In other cases of this magnitude, defense counsel have moved early in the case to have a coordinating discovery attorney appointed to coordinate the production of material to counsel and to defendants who are in custody, and to assist defense counsel in the review of discovery. The Government would have no objection to the appointment of such an attorney.  If the Court intends to appoint a coordinating discovery attorney, it should be done sufficiently in advance of the Government's discovery deadline to be able to assist defense counsel meaningfully.

**III.    Scheduling**

The Government proposes below for the Court's and counsel's consideration a scheduling procedure based upon those employed by the Honorable Paul A. Engelmayer, United States District Judge, in United States v. Leonides Sierra, et al., 11 Cr. 1032 (PAE) (a gang case that initially charged 50 defendants), and by the Honorable Colleen McMahon, Chief United States District Judge, in United States v. Anthony Boykin, et al., 10 Cr. 391 (CM) (a gang case that initially charged 60 defendants), which were also cases with large numbers of defendants and voluminous discovery.  As Judges Engelmayer and McMahon accomplished in Sierra and Boykin, our proposal is intended to move the cases expeditiously toward trial, utilize judicial and governmental resources efficiently, and afford sufficient time for defendants to review the voluminous discovery and reach pretrial dispositions where appropriate, as well as to avoid:  (a) a single defendant facing multiple trials; (b) trials of more than three months in length;[4] or (c) more than five defendants per trial.

In particular, we propose the following procedure:

- At the initial pretrial conference in each case, the Court should:

    o   Set a deadline of 45 days for the Government to produce Phase I of the discovery and another 45 days for the Government to produce Phase II of the discovery, with any additional discovery to be produced promptly on a rolling basis.

---

[3] The Government proposes to produce the following in Phase I:  individual discovery, all wiretap materials and recordings, all consensual recordings, and all search warrant applications and returns completed as of that date.

[4] Based upon the investigation to date, and the Government's experience in other cases of this magnitude, it is unlikely that any trial in this case would last more than one to two months.  The Government's reference to three months is a conservative outside estimate.  In the unlikely event that the estimate changes so significantly that a four-month trial appears likely, the Government will advise the Court and counsel promptly.  See Casamento, 887 F.3d at 1152.

    o   Schedule a pretrial conference in approximately four months, at which time the Government proposes that the Court set a schedule for the filing of pretrial motions.  In advance of this conference, the Government will send a letter to the Court proposing an initial wave, or waves, of defendants for the scheduling of trials at the Court's convenience.

•   At the second pretrial conference in the case, the Government proposes that the Court rule on the Government's proposal for the grouping of defendants for trials, and set trial dates.

As stated above, this procedure is based on those followed by Judges Engelmayer and McMahon, respectively, in the <u>Sierra</u> and <u>Boykin</u> cases.  An overview of the procedural history of these cases illustrates how they met the goals of efficiency and fairness to all parties and are consistent with Government's proposal here.

In the <u>Sierra</u> case before Judge Engelmayer, in December 2011, approximately 50 members and associates of the Trinitarios street gang were charged with racketeering conspiracy, narcotics conspiracy, and/or firearms charges.  After the Government had the opportunity to produce discovery, the defense had the opportunity to review discovery, and the parties began discussions in many instances regarding pretrial dispositions, on May 30, 2012, the Court granted the Government's motion to sever the case into two equal groups:  (a) a group of 25 defendants, "Group A," against whom the Government did not intend to add additional charges in a Superseding Indictment, and for whom the Government proposed trial dates be set; and (b) a group of 25 defendants, "Group B," involved in acts of violence that the Government expected to include in a Superseding Indictment.   The Court set trial dates in early 2013 for the defendants in Group A, all of whom subsequently pled guilty.  With respect to Group B, Judge Engelmayer set a deadline for Superseding Indictments of December 2012.  The Government obtained a Superseding Indictment in December 2012 charging substantive racketeering offenses, including nine murders in aid of racketeering, and adding 26 new defendants.  In the Spring of 2014, two defendants from Group B went to trial, which lasted approximately seven weeks.   In the Fall of 2014, three defendants from Group B went to trial, which lasted approximately three months.

In the <u>Boykin</u> case, in May 2010, approximately 60 members and associates of the Newburgh Bloods street gang were initially charged with narcotics offenses.  Judge McMahon held the second pretrial conference in September 2010.  At that time, Judge McMahon adjourned to December 2010, allowing the defendants to make any motions related to the applicability of the Fair Sentencing Act of 2010, which applicability was, at the time, undecided.  Judge McMahon then adjourned, allowing defendants to file any pretrial motions, which they did, and indicating that she would render her decisions on any pretrial motions at conferences in late March and early April 2011.  Additionally, Judge McMahon ordered the Government to update the Court on a prospective superseding racketeering indictment.  In January 2011, the Government wrote to Judge McMahon, setting forth the racketeering acts it was investigating, and indicating that it had told defense counsel who it was, and was not, considering superseding against for racketeering violations.  In light of the nature and timing of the pretrial motions, and the ongoing need for defendants to enter guilty pleas, Judge McMahon adjourned the conferences to May 2011.  At that time, Judge McMahon set a trial date of December 2011.  In September 2011, when there were nine original defendants remaining, the Government superseded to add racketeering and/or capital charges against four of the original defendants and

eleven new defendants.  Judge McMahon, with the consent of the Government, severed the 15 racketeering/capital defendants from the five non-racketeering/capital defendants, and kept the December 2011 trial date for those five defendants.  One defendant ultimately went to trial in December 2011.  In October 2011, Judge McMahon appointed learned counsel to the capital defendants and adjourned to January 2012.  In January 2012, the Government announced that it would not seek the death penalty against any defendants, and, in order to accommodate the schedules of the racketeering defendants' counsel, Judge McMahon scheduled trial for February 2013.  In February 2013, the two defendants who had not pled guilty went to trial.

The Government notes, in conclusion, that it intends to submit to the Court and the defendants so-called "enterprise letters" during the course of this case.  As the Court is aware, these are letters routinely provided by the Government in racketeering cases that list the particular acts that the Government expects to prove at trial in connection with the racketeering conspiracy charge.  Initial enterprise letters were submitted in the Sierra case in August 2012 (approximately seven months after the initial charges), and in the Boykin case in October 2011 (approximately seventeen months after the initial charges).  The Government respectfully proposes to provide an initial enterprise letter in each of the defendants in this case in April 2017 (approximately eight months after the initial charges), with any supplementary enterprise letters to be provided thereafter as the investigation progresses.

The Government will be prepared to address the issues raised in this letter or any inquiries from the Court at the initial pretrial conference scheduled for August 23, 2016.

Respectfully submitted,

PREET BHARARA
United States Attorney


By: _____/s/_____
    Amanda Kramer/Abigail Kurland/
    Jessica Lonergan/Jonathan Rebold/
    Lauren Abinanti (SAUSA)
    Assistant United States Attorneys
    (212) 637-2478/2955/1038/2512


cc:  All defense counsel (by email)