UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x
                                  :

UNITED STATES OF AMERICA      :

                                  :

           - v. -          :                 S43 16 Cr. 522 (RJS)

                                  :

JOSEPH MERLINO,          :
  a/k/a "Joey," and      :
EUGENE O'NOFRIO,       :
  a/k/a "Rooster,        :

                                  :

                                  :

                Defendants.     :

------------------------------------------------------ x


# THE GOVERNMENT'S MOTIONS *IN LIMINE*


JOON H. KIM
Acting United States Attorney
for the
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007


Max Nicholas
Lauren Schorr
Andrew Chan
Assistant United States Attorneys
    *- Of Counsel -*

## PRELIMINARY STATEMENT

The Government respectfully submits these motions *in limine* in advance of trial against Joseph Merlino and Eugene O'Nofrio, which is scheduled to begin on January 16, 2018.   On November 6, 2017, Merlino and O'Nofrio were charged in superseding indictment S43 16 Cr. 522 (RJS) (the "Indictment") with participating in a racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).   The Indictment also charges Merlino with participating in a conspiracy to commit healthcare fraud, wire fraud, and mail fraud, in violation of Title 18, United States Code, Section 1349; and with participating in a conspiracy to commit gambling offenses, in violation of Title 18, United States Code, Section 371.   In addition, the Indictment charges O'Nofrio with participating in a conspiracy to commit gambling offenses, in violation of Title 18, United States Code, Section 371; with participating in a conspiracy to traffic contraband cigarettes, in violation of Title 18, United States Code, Section 371; and with conspiring to make, and in fact making, extortionate extensions of credit, in violation of Title 18, United States Code, Section 892.   Merlino and O'Nofrio were initially charged with racketeering conspiracy on August 1, 2016 as part of a 46-defendant indictment.

The Government moves *in limine* on three issues.   First, the Government moves to preclude cross-examination of two law enforcement witnesses concerning an internal investigation that the Federal Bureau of Investigation's ("FBI's") Office of Professional Responsibility ("OPR") conducted in connection with this case.   Second, the Government seeks permission to introduce limited evidence of the fact that Merlino was on supervised release for part of the duration of the charged racketeering conspiracy, and that he violated a condition of his supervised release and served a brief period of incarceration as a result.   Finally, the Government moves to preclude cross-examination of two cooperating witnesses about incidents of domestic violence.

The Government also provides notice below of evidence of the defendants' prior convictions that it would seek to introduce, pursuant to Federal Rule of Evidence 404(b), in the event that the defendants make certain arguments at trial.

## BACKGROUND

I.      **Overview of the Enterprise and the Defendants' Roles**

The Government expects the evidence at trial to establish the following facts, among others.

From at least in or about 2010, up to and including at least in or about June 2016, defendants Joseph Merlino and Eugene O'Nofrio were members of an organized crime enterprise that operated along the East Coast of the United States, including in New York, Massachusetts, Connecticut, Pennsylvania, and Florida (the "East Coast LCN Enterprise," or "Enterprise").  The Enterprise was comprised primarily of members and associates of organized crime families that functioned within the nationwide criminal organization known as "La Cosa Nostra" or "LCN," sometimes referred to as the "Mafia" or the "Mob."  In particular, the Enterprise was comprised of members and associates of five La Cosa Nostra organized crime families: the Genovese Organized Crime Family, the Gambino Organized Crime Family, the Lucchese Organized Crime Family, the Bonanno Organized Crime Family, and the Philadelphia Organized Crime Family (collectively, the "Organized Crime Families").   A person's status or rank within one of the Organized Crime Families was a significant factor in determining his status within the broader Enterprise.  Members of the Enterprise operated along the East Coast as an organization to accomplish the primary objective of the Enterprise, which was to make money through a variety of illegal means.

The Enterprise employed a number of illegal schemes in order to make money. These schemes included, but were not limited to, loansharking; conducting illegal gambling activity (including through bookmaking, facilitating the placement of wagers by professional gamblers by arranging for them to obtain accounts, and collecting gambling debts); healthcare fraud (including through causing the issuance of unnecessary prescriptions for a compound pain cream in order to defraud insurance companies into making enormous reimbursement payments to pharmacies with which the Enterprise was affiliated); selling untaxed cigarettes; and trafficking firearms. The Enterprise also involved efforts to fraudulently exploit commercial activities such as, for example, construction projects and street fairs, for monetary gain. Members of the Enterprise also committed acts of violence and intimidation in order to support and protect their profit-making activities.

Joseph Merlino held a prominent status in the Enterprise due in large part to his high-ranking position within the Philadelphia Organized Crime Family. During the period charged in the Indictment, Merlino was primarily based in South Florida, and also spent time in Philadelphia. In both of those areas, Merlino was deeply involved in the Enterprise and directly involved in its criminal activities, which were carried out in part within the Southern District of New York. Merlino also had a supervisory role with respect to other members in the Enterprise, including over individuals in South Florida and Philadelphia, and received payments from members of the Enterprise, sometimes referred to as "tribute" payments, by virtue of his high rank.

Merlino participated in the healthcare fraud scheme perpetrated by the Enterprise in several ways. Among other things, he helped to broker meetings and resolve disputes between members of the Enterprise involved in the scheme, in order to ensure its continuation and profitability; he helped to recruit one or more individuals with access to pharmacies to assist in

the scheme; and he made money from the scheme, receiving and sometimes demanding payments from other participants.

Merlino also furthered the gambling activities perpetrated by the Enterprise in diverse ways. Among other things, he served with other members of the Enterprise as a bookmaker for a professional sports gambler ("Gambler-1") and, upon the Enterprise incurring a significant debt to Gambler-1 as a result of successful wagers that Gambler-1 placed, enlisted another member of the Enterprise to frustrate Gamber-1's efforts to collect the money he was owed. Merlino also intervened to resolve a dispute that arose when a member of the Enterprise whose job it was to collect and pay debts for an offshore gambling organization affiliated with the Enterprise lost the supply of money with which he had been entrusted to pay debts. More generally, Merlino participated in the Enterprise's efforts to find accounts for bettors.

Eugene O'Nofrio, like Merlino, held a prominent status in the Enterprise during the period alleged in the Indictment, due in large part to his position as an acting captain within the Genovese Organized Crime Family. O'Nofrio assumed the captaincy while his predecessor, Conrad Ianniello, was serving a period of incarceration. O'Nofrio supervised other members of the Enterprise, including individuals based in Massachusetts. O'Nofrio was primarily based in Connecticut, but also spent time in New York and South Florida, and in each of those areas he engaged in activities to further the objectives of the Enterprise.

O'Nofrio participated in the loansharking activities perpetrated by the Enterprise by making a $30,000 loan to an associate of the Enterprise at an exorbitant interest rate, which he enforced through the threat of violence. O'Nofrio also agreed with other members of the Enterprise to sell untaxed cigarettes, and to serve as a bookmaker for numerous sports gamblers. During the course of the charged racketeering conspiracy, O'Nofrio made allusions to his high-

ranking role in the Enterprise and the power that he wielded within it, including the power to

"make" someone, *i.e.*, to turn an associate of the Enterprise into a full-fledged member who

would be entitled to earn more money from the activities of the Enterprise.  O'Nofrio also

compared his own role to that of Merlino and that of co-conspirator Pasquale Parrello, a/k/a

"Patsy," as well as others.

## II.    Overview of Expected Government Witnesses at Trial

The Government currently intends to call three cooperating witnesses at trial, in addition

to law enforcement witnesses, expert witnesses, and others.

The first cooperating witness ("CW-1") began cooperating with the Government in or

about late 2011.  At the time he began cooperating with the Government, CW-1 was an associate

of the Enterprise who was based in New York City and who worked under Parrello.  In or about

2013, with Parrello's approval, CW-1 began to split his time between New York City and South

Florida, where he began working under Merlino.  At the direction of law enforcement, beginning

in or around 2012 and while in New York and Florida, CW-1 made consensual recordings of

many members of the Enterprise, including Merlino, O'Nofrio, and Parrello.  Many of these

recordings capture statements made in furtherance of the racketeering conspiracy and the other

charged conspiracies, including statements by Merlino, O'Nofrio, Parrello, and numerous co-

conspirators.  As a general matter, the recordings that the Government plans to introduce at trial

include, but are not limited to, statements by Merlino, O'Nofrio, and other co-conspirators about

the activities of the Enterprise (for example, conversations about progress being made in the

scheme to cause the issuance of unnecessary prescriptions for a compound pain cream),

statements about the status that various members and associates of the Enterprise held (for

example, conversations about who has the power to "make" members of the Enterprise), and

conversations that serve to foster trust and cohesiveness between and among members of the Enterprise (for example, a conversation in which Merlino and O'Nofrio confide in each other about issues regarding the Enterprise and discuss, in substance and in part, that it is easy to kill somebody, but that it is better to save a friend).[1]

The Government anticipates that among other things, CW-1 will testify about Merlino's status within and involvement in the Enterprise; Merlino's participation in the healthcare fraud scheme perpetrated by the Enterprise, which entailed mail and wire fraud; and Merlino's involvement in the Enterprise's illegal gambling operations.  CW-1 will also testify, among other things, about O'Nofrio's role within and involvement in the Enterprise; O'Nofrio's extension of an extortionate $30,000 loan to another member of the Enterprise; and O'Nofrio's agreement to traffic untaxed cigarettes and commit gambling offenses with the Enterprise.  The Government also anticipates that among other things, CW-1 will identify other members of the Enterprise; describe the goals and activities of the Enterprise; explain how members of different Organized Crime Families worked together as part of the Enterprise in order to accomplish its goals; and discuss statements that Merlino, O'Nofrio, and other members of the Enterprise made in furtherance of the charged racketeering conspiracy and other conspiracies.  The Government expects that much of the testimony given by CW-1 will be corroborated, in part, by the consensual recordings that CW-1 made.

The second cooperating witness ("CW-2") was an associate of the Enterprise who began cooperating with the Government in or about 2016.  CW-2 was based in Florida and participated

---

[1] The Government's current exhibit list, which is being submitted to defense counsel on December 1, 2017, includes a list of all the recordings that the Government presently intends to introduce at trial.  As the Government continues to prepare for trial, it is likely to further narrow that list of recordings, and will advise defense counsel of (1) the eventual narrowed list and (2) the specific portions of the recordings that it intends to play at trial.

in the healthcare fraud scheme referenced above, in connection with which he observed Merlino receive payments from at least one other associate of the Enterprise.  CW-2 also discussed the scheme with Merlino and paid Merlino money that Merlino claimed he was owed for his role in the scheme.  The Government anticipates that among other thing, CW-2 will testify about the specific workings of the healthcare fraud scheme; Merlino's role in the healthcare fraud scheme, his conversations with Merlino about that scheme; and about other dealings he had with Merlino, including with respect to a restaurant that Merlino started in South Florida.

The third cooperating witness ("CW-3") was a member of the Enterprise who had a high-ranking position in the Bonanno Organized Crime Family.  CW-3 began cooperating with the Government in or around 2016 after facing charges in state court for an assault.  During the period of the charged racketeering conspiracy, and prior to cooperating with the Government, CW-3 interacted with both Merlino and O'Nofrio in CW-3's capacity as a member of the Enterprise, and learned through those interactions and through statements made to him by other members of the Enterprise about the status that both Merlino and O'Nofrio held within the Enterprise.  The Government anticipates that among other things, CW-3 will testify about the background, methods, and goals of the Enterprise, including how members of different Organized Crime Families worked together as part of the Enterprise; his interactions with Merlino and O'Nofrio during the period of the charged racketeering conspiracy; statements made to CW-3 by other members of the Enterprise concerning Merlino and O'Nofrio and the workings of the Enterprise; and the status that Merlino and O'Nofrio held within the Enterprise.

In addition to the three cooperating witnesses discussed above, the Government intends to call two law enforcement witnesses (referred to herein as "Agent-1" and "Agent-2") to testify about the investigation in this case, the methods that the FBI used in the investigation, and the

physical evidence obtained in the course of the investigation, including, among other things, audio and video recordings, surveillance photographs, cash, cases of untaxed cigarettes, documents relating to the operation of gambling business such as ledgers and pages from gambling websites, cellphones, and the contents of cellphones that law enforcement agents seized and searched as part of the investigation. The Government also intends to call two expert witnesses: Criminal Investigator John Carillo, as an expert witness on organized crime, and Special Agent Steven E. Dickey from the Bureau of Alcohol, Tobacco, Firearms and Explosives, as an expert witness on the distribution of contraband and untaxed cigarettes, state and federal laws and regulations relating to the sale and taxation of cigarettes, and the lingo and code words used by individuals in smuggling contraband and untaxed cigarettes.

The Government also intends to call representatives from CVS Caremark and Express Scripts, two pharmacy benefit management ("PBM") organizations that received, processed, and reimbursed prescriptions once they were filled by pharmacies affiliated with the Enterprise (the "PBM Witnesses"). PBM organizations were victims of the healthcare fraud scheme because they authorized payments to the pharmacies, unaware that the prescriptions had been obtained fraudulently, including through bribes to doctors and patients, and were medically unnecessary. After the claims were reimbursed by the PBM organizations, the pharmacies affiliated with the Enterprise provided a portion of the profits from these prescriptions to members and associates of the Enterprise. The PBM Witnesses will elaborate on business records showing the paid and rejected claims for prescriptions that were issued by doctors and patients affiliated with the healthcare fraud scheme. The PBM Witnesses will also explain that any reimbursements for prescriptions that were based on bribes or kickbacks to doctors or patients, or that were otherwise medically unnecessary, would have been rejected, if known to the PBMs.

7

Finally, the Government intends to call a United States Probation Officer (the "Probation Officer") who supervised Merlino in the Southern District of Florida while he was on supervised release in 2013 and 2014.  Among other things, the Government expects the Probation Officer to testify that it was a requirement of Merlino's supervised release that he report to the Probation Department any employment he undertook and any income he was earning, and to testify concerning what Merlino reported and what he did not report to the Probation Department during that time period, as further discussed below.  The Government likewise intends to call a custodial witness to introduce Merlino's tax returns during approximately this same period for the purpose of establishing what sources of income Merlino did and did not report during this period of time. The Government also intends to call custodial witnesses to introduce certain bank records relevant to the health care fraud scheme, and may also call other custodial witnesses.  The Government may add (or subtract) witnesses as it continues to prepare for trial.

## ARGUMENT

### I.   The Defendants Should Be Precluded from Cross Examining Law Enforcement Witnesses Concerning an Internal Investigation by FBI's Office of Professional Responsibility

The Government has notified counsel for Merlino and O'Nofrio (as well as counsel for other defendants in the case) that the FBI's Office of Professional Responsibility ("OPR") conducted an internal investigation into certain aspects of law enforcement agents' management of the case, including FBI agents' supervision of a cooperating witness and documentation of their work.  As agents assigned to the case, Agent-1 and Agent-2, both of whom the Government plans to call at trial, were among those whose management of the case was evaluated.  Following its internal investigation, OPR found that Agent-1 had failed to timely generate and upload several investigative reports during the course of the investigation, as a result of which Agent-1

8

was suspended for five days.  OPR found that Agent-2 had not violated any FBI policy, and no

disciplinary action was taken with respect to Agent-2.

The Government respectfully submits that the Court should preclude any cross-

examination of Agent-1 or Agent-2 regarding the OPR investigation or its results, because such

cross-examination would not be probative of the credibility of these witnesses.  Additionally, any

marginal probative value to be found in such cross-examination would be substantially out-

weighed by the danger of creating a "trial within a trial" relating to the alleged misconduct, and

the confusion and distraction that would ensue from that.

### A.  Applicable Law

Federal Rule of Evidence 608(b) provides that:

> Specific instances of the conduct of a witness, for the purpose of
> attacking or supporting the witness' credibility . . . may not be
> proved by extrinsic evidence. They may, however, in the discretion
> of the court, if probative of truthfulness or untruthfulness, be in-
> quired into on cross-examination of the witness (1) concerning the
> witness' character for truthfulness or untruthfulness . . . .

In order for specific instances of conduct to be considered for admission at trial, there must be

proof that the conduct actually occurred.  *See Michelson v. United States*, 335 U.S. 469, 482

(1948) ("[A]rrest without more does not . . . impeach the integrity or impair the credibility of a

witness . . ."); *Huddleston v. United States*, 485 U.S. 681, 689 (1988) (holding in the context of

similar acts evidence that such evidence is relevant only if the jury can reasonably conclude that

the act occurred and that the witness performed the act).

Furthermore, even if there is evidence that an incident occurred and the court determines

that the incident would be probative of the witness's character for truthfulness, the court must

still decide whether the probative value of the evidence is substantially outweighed by unfair

prejudice. *United States v. Devery*, 935 F. Supp. 393, 406 (S.D.N.Y. 1996) (quoting Rule 403);

9

*see also* Fed. R. Evid. 608(b), 1972 advisory committee note (noting that questioning pursuant to

Rule 608(b) is limited by the "overriding protection of Rule 403").  It is well settled that the

scope and extent of cross-examination is within the sound discretion of the court, *United States*

*v. Wilkerson*, 361 F.3d 717, 734 (2d Cir. 2004), and that the court may properly bar cross-

examination which is marginally relevant to the issues before the court. *United States v.*

*Maldonado-Rivera*, 922 F.2d 934, 956 (2d Cir. 1990). "[T]he decision to restrict cross-

examination will not be reversed absent an abuse of discretion." *United States v. Lawes*, 292

F.3d 123, 131 (2d Cir. 2002) (internal citations omitted).

      Applying this framework, courts have consistently precluded cross-examination of law

enforcement witnesses relating to unsubstantiated accusations of wrongdoing – both because of

their limited probative value and because of the high likelihood that such cross-examination

would cause distraction and delay.  *See United States v. Fernandez*, 2009 WL 10637246, at \*2

(S.D.N.Y. Dec. 30 2009) (RJS) (finding that unsubstantiated and exonerated complaints filed

against law enforcement officers did not rise to the level of "material evidence"); *United States v.*

*Belk*, 2002 WL 342585, at \*\*3-4 (S.D.N.Y. Mar. 4, 2002) (LTS) ("To provide the jury with

information sufficient to weigh fairly the significance of the charge would delay the trial

needlessly and distract the attention of the jury from the issues that are central to the criminal

charge in this case."); *United States v. Akefe*, 568 F. App'x 1, 4 (2d Cir. 2014) (concluding that

district court appropriately precluded defendant from cross-examining a law enforcement witness

regarding a closed, unrelated, and unsubstantiated OPR investigation).  The Second Circuit has

similarly upheld the discretion of district courts to preclude cross-examination of civilian

witnesses regarding unproven allegations of wrongdoing and criminal activity.  *See United States*

*v. Rosa*, 11 F.3d 315, 336 (2d Cir. 1993) (district court properly precluded cross-examination on

alleged rape and burglary by witness because conduct did not bear directly on witness's credibility and allegations were unsubstantiated); *United States v. Conception*, 983 F.2d 369, 392 (2d Cir. 1992) (district court properly barred inquiry into alleged murder by witness because there was insufficient evidence that murder occurred or that it was committed by witness).

Similarly, courts have consistently precluded cross-examination of law enforcement witnesses based on substantiated allegations of misconduct, where the misconduct does not relate to the witness's character for truthfulness or untruthfulness. *See, e.g.*, *United States v. Laster*, 2007 WL 2872678, at **1-2 (S.D.N.Y. Sept. 28, 2007).  In *Laster*, the Government moved to preclude cross-examination of an NYPD officer relating to a substantiated complaint filed with the Civilian Complaint Review Board ("CCRB") that the witness had previously failed to secure prompt medical attention for an arrestee.  *Id.* at *1.  In precluding cross-examination based on this incident, Judge Keenan found that the allegations in the CCRB complaint – though substantiated – did not bear on the witness's character for truthfulness.  *Id.* at *2.  Judge Keenan also found that there was no allegation that the witness had lied about or otherwise attempted to "cover-up" the incident, and the CCRB made no finding regarding the witness's credibility.  *Id.* at *2.  Other courts have similarly found that substantiated allegations of law enforcement misconduct are not proper grounds for cross-examination where the misconduct does not bear on an officer's credibility.  *See, e.g.*, *United States v. Teron*, 478 F. App'x 683, 685 (2d Cir. 2012) (upholding district court's limitation on cross-examination based on CCRB proceedings when CCRB did not make any findings with respect to the witness's credibility); *United States v. Horsford*, 422 F. App'x 29, 2011 WL 1878747, at *1 (2d Cir. 2011) (upholding trial court's preclusion of CCRB reports where the underlying conduct involved no dishonesty); *United States v. Lights*, 2016 WL 7098633, at *4 (S.D.N.Y. Dec. 5, 2016) (precluding cross-

11

examination on a substantiated CCRB complaint that "does not weigh towards [the witness]'s propensity for truthfulness");  *United States* v. *Nelson*, 2011 WL 2207584, at *6 (S.D.N.Y. June 3, 2011) (holding that "given the informal and non-adversarial nature of the CCRB investigative process, any probative value of the CCRB complaint was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and waste of time under Rule 403"); *United States v. Polanco*, 2011 WL 1795293, at *4 (S.D.N.Y. May 3, 2011) (precluding cross-examination of substantiated CCRB complaints because there was no evidence that the CCRB found the witness to be not credible).

### B.    Analysis

Based on the foregoing framework, the Court should preclude any cross-examination of Agent-1 or Agent-2 relating to the OPR investigation.  As a threshold matter, OPR concluded that Agent-2 did not violate any FBI policy, and no disciplinary action was taken with respect to Agent-2.  There is thus no good-faith basis to cross-examine Agent-2 about the OPR investiga- tion, as there is no reason to believe that Agent-2 violated any FBI policy in the course of this case.  Cross-examining Agent-2 as to the OPR investigation would be akin to examining a police officer about a CCRB allegation that proved to be unsubstantiated: it would be a fishing expedition into the merits of an allegation that was found to be unsubstantiated, and would entail a mini-trial of the allegation.  Such a mini-trial would unduly delay the actual trial, as well as distract the jury from the issues being tried and risk confusing the jury.  On this ground alone, cross-examination of Agent-2 about the OPR investigation should be precluded.

There is an additional ground on which cross-examination of Agent-2 about the OPR investigation should be precluded, and this ground applies equally to cross-examination of Agent-1 about the OPR investigation and its results.  The OPR investigation, and the finding that

Agent-1 failed to timely generate and upload several investigative reports, have no bearing on the credibility of Agent-1 or Agent-2.  The OPR investigation did not concern whether Agent-1 or Agent-2 had lied, and the results of the investigation do not reflect that either of them was untruthful in any way.  Because neither the investigation nor its results implicate Agent-1's or Agent-2's credibility, they do not fall within the ambit of appropriate cross-examination under Rule 608(b).  Moreover, cross-examination on these topics would unduly extend the trial by generating a mini-trial on the merit of the allegations that were considered by OPR.  In addition, with respect to Agent-1, were there to be cross-examination about the finding that Agent-1 failed to timely generate and upload several investigative reports, the Government would seek to provide evidence to the jury contextualizing OPR's finding, and establishing the informal and non-adversarial process by which OPR conducts its investigations.  This, too, would delay the trial.  Given the lack of probative value that cross-examination as to the OPR investigation or its findings would have as to either Agent-1's or Agent-2's credibility, and the sideshow that would result from such cross-examination, which would lengthen the trial and distract the jury from the issues that are being presented for decision, the Government respectfully requests that the defendants be precluded from inquiring of Agent-1 or Agent-2 about the OPR investigation or its results.

## II.     Limited Evidence that Merlino was on Supervised Release during the Course of the Charged Racketeering Conspiracy, and That He Violated Supervised Release, Is Admissible

Beginning in at least approximately 2012, Merlino was on supervised release following his completion of a jail sentence after a 2001 conviction in the Eastern District of Pennsylvania for racketeering (Merlino was also acquitted of several counts in that case).  *United States v. Merlino et al.*, 2:99 Cr. 363.  During his term of supervised release, Merlino was supervised, in

relevant part, by the United States Probation Department in the Southern District of Florida, which was Merlino's primary district of residence at the time.  Merlino's term of supervised release lasted until approximately late 2014, when he was found, after an evidentiary hearing, to have violated one of its conditions.  Merlino then served a term of incarceration of approximately four months for that violation.

The Government seeks to introduce at trial the fact that Merlino was on supervised release for part of the charged conspiracy, and specifically during 2013 and part of 2014.  The Government also seeks to introduce that Merlino violated his supervised release and served a period of incarceration of approximately four months.  The Government does not seek to introduce the nature of the underlying offense that led to the term of supervised release, nor the fact that it was a felony, nor the manner in which Merlino violated his supervised release.

The Government seeks to introduce evidence concerning Merlino's term of supervised release for several reasons.  First, the Government intends to introduce evidence that Merlino was required as a condition of his supervised release to inform his Probation Officer of any employment that he held and income that he received from that employment during the period of his release.  The Government's understanding is that Merlino did not report to his Probation Officer that he was receiving payments in connection with the Enterprise's healthcare fraud scheme; or that he received "tribute" payments in connection with his role in the Enterprise; or that he engaged in, and profited from, bookmaking in connection with the Enterprise.  Merlino's failure to report his income from these activities to his Probation Officer is probative of his consciousness of guilt, and particularly of his understanding that the healthcare scheme in which he participated was fraudulent, and not a legitimate endeavor.

14

In addition, the fact that Merlino violated his supervised release and served a brief term of incarceration is necessary to contextualize certain recorded statements by co-conspirators that are probative of Merlino's role in the Enterprise.  For example, in one recorded conversation, O'Nofrio discusses with CW-1 O'Nofrio's intention to send Merlino money while Merlino is in prison for the violation.  In multiple other recorded conversations, members of the Enterprise discuss the fact that Merlino was found to have violated his supervised release.  These conversations are relevant to prove the relationship that existed between Merlino and other members of the Enterprise, including O'Nofrio.[2]

Finally, the fact that Merlino was on supervised release is necessary to explain why he often arranged for others – sometimes a co-conspirator and sometimes CW-1 – to take on a more visible role in the Enterprise's activities than he did, as he understood that he was subject to particular scrutiny during his period of supervised release.

A.    **Applicable Law**

Relevant evidence is admissible pursuant to Rules 401 and 402 of the Federal Rules of Evidence.  *See, e.g.*, *United States* v. *Amrep Corp.*, 545 F.2d 797, 800 (2d Cir. 1976) ("Relevant evidence should be admitted and not excluded[;] [i]t makes no difference whether such evidence is particularized in the indictment").  "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency. Relevant evidence is not confined to that which direct establishes an element of the crime."  *United States* v. *Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997); *see also, e.g.*,  *United States* v. *Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in

---

[2] The Government does not seek to introduce in its case in chief evidence about Merlino's prior crimes, other than the evidence of his supervised release discussed herein.

order to provide background for the events alleged in the indictment.  Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.").

Under this standard, relevant evidence concerning acts by the defendant that are not charged in the Indictment may be admitted without reference to Rule 404(b) of the Federal Rules of Evidence if it constitutes direct proof of charged criminal conduct, if it is inextricably linked with the charged conduct, or if it is necessary to complete the story of the crimes on trial.  *See United States* v. *Quinones*, 511 F.3d 289, 309 (2d Cir. 2007) ("[E]vidence of uncharged criminal conduct is not evidence of 'other crimes, wrongs, or acts' under Rule 404(b) if that conduct is inextricably intertwined with the evidence regarding the charged offense," and thus "necessary to complete the story of the crime on trial" (internal quotation marks and citations omitted); *United States* v. *Towne*, 870 F.2d 880, 886 (2d Cir. 1989) (same).  Such evidence may also be properly admitted as direct evidence to show, for example, the development of an illegal relationship between the defendant and his co-conspirators, and to explain the mutual trust that existed between co-conspirators.  *See United States* v. *Rosa*, 11 F.3d 315, 333-34 (2d Cir. 1993) (evidence of prior acts of car theft and drug dealing properly admitted to show development of illegal relationship between defendant and co-conspirator and to explain how defendant came to play important role in conspiracy); *United States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (evidence of pre-existing drug trafficking relationship between defendant and co-conspirator admissible to aid jury's understanding of how transaction for which defendant was charged came about and his role in it); *United States* v. *Araujo*, 79 F.3d 7, 8 (2d Cir. 1996) ("other acts evidence is admissible to show the background of a . . . relationship of trust"); *United States* v. *Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) ("'it is within the [trial] court's discretion

16

to admit evidence of prior acts . . . in order to help explain how the illegal relationship between the participants in the crime developed'") (quoting *Rosa*, 11 F.3d at 334).

Evidence of other crimes, wrongs, or acts taken by the defendant – including prior criminal convictions – can also be admissible pursuant to Rule 404(b) of the Federal Rules of Evidence. Federal Rule of Evidence 404(b) provides, in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed. R. Evid. 404(b). The Second Circuit "ha[s] adopted an inclusionary approach to evaluating Rule 404(b) evidence, which allows evidence to be received at trial for any purpose other than to attempt to demonstrate the defendant's criminal propensity." *United States* v. *Edwards*, 342 F.3d 168 (2d Cir. 2003) (internal quotation marks and citations omitted). While any evidence offered pursuant to Rule 404(b) is subject to the balancing test set forth in Rule 403, the Second Circuit has long made clear that "other act" evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial. *Roldan-Zapata*, 916 F.2d at 804; *see also United States* v. *Williams*, 205 F.3d 23, 34 (2d Cir. 2000); *United States* v. *Paulino*, 445 F.3d 211, 223 (2d Cir. 2006); *cf. Costantino* v. *Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair."); *United States* v. *Everett*, 825 F.2d 658, 660-61 (2d Cir. 1987) ("Under Rule 404(b) evidence of 'other crimes' has been consistently held admissible to corroborate crucial prosecution testimony.") (citations omitted).

In addition to setting forth these general principles, courts have specifically allowed evidence of a defendant's parole or supervised release status where it is probative of the defendant's

17

guilt or innocence of the crimes charged.  In *United States v. Stitsky*, 536 F. App'x 98, 106–07 (2d Cir. 2013), the Second Circuit found, applying plain error review, that a probation officer's testimony about the terms of a defendant's supervised release was admissible where the defendant's omission of certain information from his reports to his probation officer supported an inference that the defendant knew he was engaged in illegal activities.  The Second Circuit found such testimony to be direct evidence of the defendant's guilt, and that it would have been admissible in the alternative under Rule 404(b) to show the defendant's criminal intent.  *See id.* at *76.  The Second Circuit further found that the defendant would not be unfairly prejudiced by the admission of testimony that he had violated his supervised release, because, "in any event, the fact that [the defendant] committed violations of supervised release was certainly not more sensational or more disturbing than the charged crimes."  *Id.* at **77-78.

Courts have also found that evidence of a defendant's parole status is admissible to con-textualize and explain the role that a defendant played in a criminal conspiracy, including where a defendant has played a role that is less hands-on than that of his or her co-conspirators.  *See United States v. Cruz,* 326 F.3d 392, 395 (3d Cir.2003) (affirming the admission of parole status to show why defendant delegated hand-to-hand street transactions to others); *United States v. Manarite*, 44 F.3d 1407, 1418 (9th Cir.1995) ("The explanation [for why the defendant sent others to carry out some of the crimes] was that his parole status subjected him to police scrutiny and the risk of greater punishment if caught."); *United States v. Cruz*, 326 F.3d 392, 395–96 (3d Cir. 2003) (finding that testimony about defendant's parole status was admissible where it supported motive for concealing illegal activity, where it provided an explanation for why others in the conspiracy took on a more visible role, and where the jury was given no information about "what type of crime [the defendant] committed that led to his parole status, whether it was a

felony, or what length of time, if any, he may have served in prison [for the underlying crime]");
*see also, e.g.*, *United States v. Paredes*, 176 F. Supp. 2d 192, 194–95 (S.D.N.Y. 2001) ("This
fear of being caught would help to explain the manner in which [the defendant] allegedly ran the
. . . conspiracy with which he is charged.").

### B.    Analysis

Evidence that Merlino was on supervised release for part of the duration of the charged
conspiracy, and that he violated his supervised release and went to jail for a brief period of time,
is admissible because it is probative in several respects and would not unfairly prejudice
Merlino.  The fact that Merlino did not report to his Probation Officer any income from his
involvement in the healthcare scheme, or any income from gambling-related activities, reveals
his knowledge that the healthcare scheme involved fraud – the Government expects the evidence
to show that it involved bribing doctors and patients, among other things – and also reveals that
he understood that his gambling activities were illegal.

Merlino's status on supervised release is also necessary to contextualize the other evidence
that will be presented at trial about his role in the Enterprise and in the healthcare and
gambling conspiracies in which he is charged.  The evidence will show that Merlino often played
a role that was less ostentatious than the role played by certain of his co-conspirators and by
CW-1 in the charged conspiracies.  Merlino's status on supervised release explains that role: he
was wary of getting caught due to the increased scrutiny he knew that he faced while on
supervised release.

Evidence of Merlino's violation of supervised release and four-month prison term
following the violation is necessary in order to show the relationship between and among
Merlino and several of his co-conspirators, including O'Nofrio.  As referenced above, in one

19

recorded conversation, O'Nofrio discussed his intention to give money to Merlino while Merlino was in jail; in many other recorded conversations, co-conspirators in the Enterprise discuss, in general terms, the fact that Merlino was found to have violated his supervised release.  These conversations demonstrate Merlino's relationship with O'Nofrio and with other members of the Enterprise, and also show the regard with which Merlino was held in the Enterprise.  Moreover, the fact that Merlino served four months in jail is necessary to explain the lack of any recorded conversations between CW-1 and Merlino during that period of the conspiracy, which could otherwise mislead the jury into a misimpression about Merlino's level of involvement.

Evidence of Merlino's status on supervised release, and his violation of supervised release and attendant four-month period of incarceration, would not unfairly prejudice Merlino. The Government does not seek to introduce the fact that the underlying crime for which Merlino was placed on supervised release was a racketeering conspiracy, or that Merlino served any jail time at all for that underlying crime, or that that underlying crime was a felony.  Nor does the Government seek to introduce the nature of Merlino's violation of his supervised release.  The fact that Merlino violated supervised release and served four months in jail is no more inflammatory than the charges on which he is being tried.  The probative value of the limited evidence that the Government seeks to introduce with respect to Merlino's supervised release far outweighs any marginal prejudice to Merlino that could result from the jury's knowledge that he was on, and violated, supervised release, and a limiting instruction could be fashioned to address any such concern.

## III.    Cross-Examination of CW-1 and CW-3 about Incidents of Domestic Violence Should Be Precluded

CW-1 and CW-3 have each disclosed to the Government that they have been involved in several physical altercations with domestic partners.  It is the Government's understanding that

none of these incidents resulted in judicial proceedings.  These incidents have no bearing on the truthfulness of CW-1 or CW-3, and their discussion at trial would be inflammatory and without probative value.  The Government respectfully submits that cross-examination of CW-1 and CW-3 about these incidents should be precluded.

### A.    Applicable Law

District courts have "broad discretion in controlling the scope of cross-examination." *United States* v. *Caracappa*, 614 F.3d 30, 42 (2d Cir. 2010) (internal quotation marks omitted). It is well-established that the Court has "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, . . . confusion of the issues . . . or interrogation that is repetitive or only marginally relevant" to the issues in dispute.  *United States* v. *Figueroa*, 548 F.3d 222, 227 (2d Cir. 2008) (quoting *Delaware* v. *Van Arsdall*, 475 U.S. 673, 679 (1986)); *see also* Fed. R. Evid. 611(a) (noting that courts "shall exercise reasonable control" over cross-examination to "avoid needless consumption of time" and to "protect witnesses from harassment or undue embarrassment") and 611(b) (limiting scope of cross-examination of witnesses to subject matter of direct examination and matters affecting credibility of witnesses).

Under Federal Rule of Evidence 608(b), the Court may restrict cross-examination about prior conduct by a witness if it finds that the conduct is not probative of truthfulness.  *See* Fed. R. Evid. 608(a) & (b); Fed. R. Evid. 608(a) advisory committee's note ("In accordance with the bulk of judicial authority, the inquiry is strictly limited to character for veracity, rather than allowing evidence as to character generally.").  The Second Circuit has determined that conduct is probative of a witness's truthfulness and therefore admissible under Rule 608(b) where, for example, the witness has previously given false testimony, made false statements on official

documents, or been determined by a judicial officer not to be credible. *See, e.g.*, *United States* v. *Whit*e, 692 F.3d 235, 249 (2d Cir. 2012), as amended (Sept. 28, 2012) (district court erred in prohibiting cross-examination of Government witness concerning judge's finding that witness was not credible in prior judicial proceeding); *United States* v. *Schatzle*, 901 F.2d 252, 255 (2d Cir. 1990) (noting witness' omission of prior arrest on bar application was "relevant to [the witness'] capacity for truthfulness"); *United States* v. *Terry*, 702 F.2d 299, 316 (2d Cir. 1983) ("Proof that a judge of the District of Columbia Superior Court before whom [expert had testified] had found that [expert] had 'guessed under oath' was probative of the weight to be accorded to his testimony.").

Further, even if such prior conduct is relevant, the Court may still exclude cross-examination of such conduct if it finds that the "probative value [of the testimony] is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403; *accord United States* v. *Devery*, 935 F. Supp. 393, 407-08 (S.D.N.Y. 1996) ("Such [prior] acts are only admissible insofar as they bear on a witness's propensity for truthfulness or untruthfulness, and, even if the prior act does concern the witness's character for truthfulness under Rule 608(b), its probative value must not be substantially outweighed by its unfairly prejudicial effect under Rule 403.").

Courts in this Circuit have also used their wide discretion over the scope and extent of cross-examination to preclude defense inquiry into domestic violence and related conduct, and other types of violence, when such acts have no bearing on a witness's veracity. *See, e.g.*, *United States* v. *Rosa*, 11 F.3d 316, 336 (2d Cir. 1993) ("Nor was it abuse of discretion to exclude evidence of certain types of acts such as rape and burglary as having an insufficient

bearing on the witness's credibility."); *United States* v. *Rabinowitz*, 578 F.2d 910, 912 (2d Cir. 1978) (approving trial court's prohibition of cross-examination into witness's "prior acts of sodomy upon young children" because such acts did not bear on the witness's credibility); *United States* v. *Agostini*, 280 F. Supp. 2d 260, 261 (S.D.N.Y 2003) (precluding cross-examination into Government witness's prior arrests for misdemeanor assault, menacing and aggravated harassment of witness's girlfriend); *United States* v. *Flaharty*, 295 F.3d 182, 191 (2d Cir. 2002) (District Court properly precluded cross-examination regarding a murder because the murder "was not relevant to [the witness's] credibility," "there was ample other material through which defendants could test his credibility and expose any bias," and "[m]urder generally is not a crime of dishonesty").

**B.      Analysis**

The incidents of domestic violence that CW-1 and CW-3 disclosed to the Government have no connection or relation to the conduct charged at trial or to the witnesses' relationship with Merlino or O'Nofrio.  Nor is the conduct "probative of the [CWs'] character for truthfulness or untruthfulness."  Fed. R. Evid. 608(b).  This conduct therefore does not provide a legitimate basis for the jury to assess the witnesses' credibility or discern whether they are telling the truth. The acts of domestic violence themselves do not implicate the witnesses' veracity, and the witnesses admitted to the incidents when asked by the Government if they had ever committed a domestic assault.  Moreover, the incidents are not among the acts for which the witnesses received immunity from prosecution by the United States Attorney's Office as part of their cooperation agreements.  There is thus no argument that the witnesses have been incentivized by any promise with respect to the incidents to cooperate with the Government.

Precluding cross-examination into incidents of domestic violence that have no bearing on the CWs' truthfulness is additionally appropriate here because the jury already will have "'sufficient information to make a discriminating appraisal of the particular witness[es'] possible motives for testifying falsely and in favor of the government.'"  *United States* v. *Devery*, 935 F. Supp. at 408 (quoting *United States* v. *Scarpa*, 913 F.2d 993, 1018 (2d Cir. 1990) (other quotations and citations omitted)); *accord United States* v. *Nosov*, 221 F. Supp. 2d at 449 (holding that ample evidence would be introduced at trial to permit jurors to form opinion of Government witness's truthfulness).  The defendants may cross-examine the CWs about the cooperation agreements under which they will testify; their participation in a racketeering conspiracy; their direct involvement in other violent assaults, which led to bodily injury;[3] and other unlawful acts that each of them have committed.  The availability of ample material with which to cross-examine both CW-1 and CW-3, including other assaults, further cements the lack of any non-cumulative probative value that would lie in inquiring about the acts of domestic violence, and the lack of any detriment to the defendants' case in the event that such inquiry is precluded.

Because cross-examination of CW-1 and CW-3 into incidents of domestic violence would be entirely non-probative of the witnesses' veracity, and would serve solely to inflame and distract the jury, this line of cross-examination should be precluded.

## IV.    404(b) Notice

Merlino was convicted in or around 2001 in the Eastern District of Pennsylvania of participating in a racketeering conspiracy; he also has a conviction from 1990 for theft of an

---

[3] CW-1 participated in a violent assault in or around 2011 in which the victim was injured, and has also been involved in other assaults; CW-3 has committed assaults using a glass and a bottle. The Government is disclosing these assaults to the defendants as part of its obligations under the Jenks Act.

interstate shipment.  O'Nofrio was convicted in 1991 in the District of Connecticut for participating in a conspiracy to distribute cocaine.  He also has a conviction from in our about 1974 for aggravated assault.

The Government does not presently seek to introduce these prior convictions in its case in chief against Merlino and O'Nofrio.  However, the Government provides notice that in the event that certain defense arguments are made through cross-examination or an affirmative defense case, or through a jury address, the Government will seek to introduce one or more of these prior convictions under Federal Rule of Evidence 404(b).

With respect to Merlino, in the event that he argues that he has never been involved in organized crime, that he is unfamiliar with organized crime terminology (for example, phrases such as "straightened out," "made," "a friend of ours"), that he did not realize that the compound pain cream and gambling schemes in which he was involved were connected with organized crime, or that as a general matter he does not get involved in illegal activities,[4] the Government will seek to introduce evidence of Merlino's prior racketeering conspiracy conviction.  In the event that the defense makes such arguments, the prior conviction for conspiracy to commit racketeering would be admissible under Rule 404(b) to show Merlino's intent to engage in organized crime activity and his knowledge of organized crime activity; it would also be admissible to show that Merlino possessed the opportunity to engage in organized crime activity, as he had access to a network of people engaged in such conduct.

---

[4] Merlino states during several recorded conversations that he does not get involved in illegal activities.  Those statements, if offered by Merlino as his own prior statements for their truth, would be inadmissible hearsay.  But in the event that any of those statements were to come in through a defense case or cross examination, the Government would then seek to introduce evidence of Merlino's prior racketeering conviction.

25

With respect to O'Nofrio, in the event that he argues that he has never been involved in criminal activity, the Government will seek to introduce evidence of his prior narcotics conspiracy conviction.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court grant the motions *in limine* set forth herein.

Dated:  New York, New York
       December 1, 2017

Respectfully submitted,

JOON H. KIM
Acting United States Attorney for the
Southern District of New York


By:                  /s/             
     Max Nicholas
     Lauren Schorr
     Andrew Chan
     Assistant United States Attorneys
     (212) 637-1565